## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO.: 09-21977-CIV-JORDAN/MCALILEY

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | : |
| | : |
| **Plaintiff,** | : |
| | : |
| **v.** | : |
| | : |
| **KEVAN D. ACORD,** | : |
| **PHILIP C. GROWNEY,** | : |
| **ALBERTO J. PEREZ,** | : |
| **JOSE G. PEREZ,** | : |
| **SEBASTIAN DE LA MAZA, AND** | : |
| **THOMAS L. BORELL** | : |
| | : |
| **Defendants.** | : |
| | : |

### AMENDED COMPLAINT

Plaintiff Securities and Exchange Commission alleges as follows:

### I. INTRODUCTION

1.      This case involves insider trading by the Defendants in the securities of Neff Corporation before an April 7, 2005 announcement of its acquisition.

2.      First, Kevan Acord, an attorney, and Philip Growney, an accountant, abused their position of trust and confidence as tax consultants to Neff when they bought $329,000 of Neff stock in the nine days before the announcement.  They bought the shares after learning during their work for Neff that another company might acquire it.

3.      Second, Alberto Perez, a business associate and close friend of Neff's CEO, learned of the possible acquisition while working at an office at Neff's headquarters two doors down from the acquisition due diligence teams.  Perez abused his position of trust and

confidence with the CEO, and misappropriated the information by tipping his brother Jose Perez. The two then used the information to purchase $282,000 of Neff stock in advance of the acquisition announcement.

4.    Third, Dr. Sebastian De La Maza, the father-in-law of Neff's CEO, learned about the pending acquisition from his daughter, who is married to Neff's CEO. During the weeks preceding the acquisition announcement, De La Maza abused his position of trust and confidence with his daughter and misappropriated this information to buy $111,000 of Neff stock.

5.    Finally, Thomas Borell, a Miami lawyer and a close friend of a Neff director (who is also the CEO's brother), misappropriated information about the acquisition. He abused the position of trust and confidence with the director and bought more than $1.3 million of Neff stock during the six weeks before the announcement – much of it while he was on a family vacation with the director. He used a client trust fund account to fund some of the purchases.

6.    By engaging in the conduct described above, and described more fully below, each of the Defendants violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Exchange Act Rule 10b-5, 17 C.F.R. § 240.10b-5. If not enjoined, the Defendants are reasonably likely to continue to violate the securities laws.

## II. JURISDICTION AND VENUE

7.    The Commission brings this action pursuant to Sections 21(d) and 21A of the Exchange Act, 15 U.S.C. §§ 78u(d) and 78u-1.

8.    The Court has subject matter jurisdiction over this action pursuant to Sections 21(e), 21A, and 27 of the Exchange Act, 15 U.S.C. §§ 78u(e), 78u-1, and 78aa.

9.    Personal jurisdiction over the Defendants and venue in the Southern District of Florida are proper because the acts, transactions, and courses of conduct giving rise to the

violations alleged in the Complaint occurred in the Southern District of Florida.  Neff was located in Miami at all relevant times, and De La Maza, Borell, and Alberto and Jose Perez all lived in the Miami area.  Furthermore, Acord and Growney provided tax consulting services to Neff, had frequent e-mail and telephone contact with Neff officers in Miami, and traded in Neff stock.

10.    In connection with the conduct alleged in this Complaint, the Defendants, directly or indirectly, singly or in concert with others, made use of the means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange.

### III.  DEFENDANTS

11.    Acord, 49, is a resident of Overland Park, Kansas.  Acord is licensed both as a lawyer and certified public accountant by the states of Kansas and Missouri.

12.    Growney, 44, is a resident of Kansas City, Missouri.  He is a certified public accountant and is employed by Kevan D. Acord, P.A.

13.    Alberto Perez, 31, is a resident of Miami, Florida.  He is a self-employed real estate consultant.

14.    Jose Perez, 34, is a resident of Miami, Florida.  For several years, he has been employed by a Miami-based public company that Jorge and Jose Mas, brothers of Neff's CEO, control.

15.    De La Maza, 71, is a resident of Miami, Florida.   He is a self-employed psychiatrist.  His daughter is married to Neff's CEO, Juan Carlos Mas.

16.    Borell, 48, is a resident of Miami, Florida, where he is a self-employed lawyer.

### IV.  RELEVANT ENTITIES

17.    Neff is a Delaware equipment rental company based in Miami, Florida.  Before

3

Odyssey Investment Partners, LLC bought it in 2005, Neff's common stock was quoted on the Pink Sheets.

18.     Odyssey is a private equity investment firm based in New York and California.

## V. FACTS

### A. Neff's Acquisition Negotiations with Odyssey

19.     In November 2004, Odyssey first contacted Neff about a potential business combination. On November 19, 2004, the parties entered into a confidentiality agreement and commenced negotiations.

20.     In late January 2005, Odyssey offered to purchase Neff for $450 million, which Neff rejected. On February 16, 2005, Odyssey increased its offer to $470 million. Several days later, Neff and Odyssey executed a letter of intent for Odyssey to purchase Neff, along with a 30-day exclusivity agreement. Extensive due diligence began shortly after that and continued for several weeks at Neff's Miami headquarters and other branch locations. During this time, Neff's CEO routinely updated Neff's board of directors about the acquisition negotiations

21.     On March 4, 2005, Neff sent Odyssey a draft acquisition agreement. During the next several weeks, the parties' representatives continued to discuss, review, and negotiate the terms of the agreement and other transaction documents.

22.     Neff's board of directors met on April 6, 2005 and approved the acquisition. The next day, Neff announced that Odyssey was buying it for an estimated price of $8.19 to $8.27 per share. The day of the announcement, Neff's stock price increased 51%, closing at $7.41 per share, with 1.2 million shares traded – compared to 58,419 shares the day before. The acquisition closed on June 3, 2005. Neff's stockholders received $8.21 per share in exchange for their stock on June 7, 2005.

### B. Insider Trading by Acord and Growney

23.    From 2003 until the Neff acquisition, Acord and Growney prepared Neff's tax returns, assisted in the preparation of the tax footnotes to the company's financial statements, and provided Neff miscellaneous tax and legal advice.    As a result, Acord and Growney communicated regularly with Neff's management and had access to confidential information about Neff's business operations.

24.    On January 6, 2005, Neff's CFO sent Acord and Growney a series of e-mails seeking their advice on the tax-related consequences of a potential change in Neff's ownership on the company's net operating losses.    In particular, Neff's CFO wanted to know whether Neff's net operating losses would have any value to a prospective purchaser or new owner of the company.    After speaking with Growney, Acord sent Neff's CFO an e-mail containing some information on the issue and offering to discuss the matter in greater detail.

25.    The following day, Neff's CFO sent Acord another e-mail requesting more information about the tax implications of an ownership change.    Acord again provided additional information concerning the issue but remarked, "this area is complex and any transaction would need to be scrubbed from a tax perspective for its actual impact on the utilization of Neff's net operating losses."    A short time later, Neff's CFO responded that the information Acord provided was sufficient, but added, "we'll obviously need to dig deeper if the transaction materializes."

26.    Odyssey's tax consultants subsequently requested in early March 2005 that Acord and Growney provide them with Neff's prior year tax and financial documents.    Growney immediately contacted Neff's Director of Financial Reporting for authority to release this confidential information.    Neff authorized Acord and Growney to provide the requested documents

to Odyssey's tax consultants, and further instructed Acord and Growney to answer all of their questions.

27.    Acord and Growney's time slips for services provided to Neff during March 2005 indicate they both assisted Neff in connection with acquisition due diligence.  Growney's time slip for March 1, 2005 indicated that he provided "due diligence assistance" by responding to numerous requests from Odyssey's tax consultants for details of the previous year's tax returns, net operating losses, and other tax issues.

28.    Acord's time slip for March 7, 2005 stated: "Due Diligence items for [Odyssey's tax consultants]; discussion with Neff's CFO." His time slip for the next day stated "Consultation regarding acquisition due diligence..." Acord's time slip for March 10, 2005 stated: "Discussion with [Odyssey's tax consultants] regarding tax due diligence." On March 29, 2005, Acord wrote on a time slip that he spent an hour discussing tax representation associated with "proposed business transaction."

29.    Also on March 29, Neff's Director of Financial Reporting sent Growney an e-mail asking him to confirm the accuracy of a list of seven management representations relating to tax matters.  One of the representations listed in the e-mail related to tax considerations after or prior to the "Closing Date."  Moreover, the term "Closing Date" was used no less than three times in this particular management representation.

30.    Only minutes after receiving that e-mail, Growney sent Neff's Director of Financial Reporting an e-mail stating, "[p]lease fill me in as to what the term closing date is referring to."

31.    A short time later, Neff's Director of Financial Reporting sent Neff's CFO an e-mail stating, "I thought you had discussed this transaction with K[evin] Acord a little? Do you

want to fill them in on this now? Do you want me to give them a call?" Neff's CFO responded, "I have not clued them in, but go ahead." Neff's Director of Financial Reporting called Growney within the hour and spent about ten minutes discussing the Odyssey acquisition.

32.    Within an hour of that phone call, Acord bought 2,200 Neff shares for his personal account and 2,100 shares for the account of one of his long time clients (the "Client Account"). He had never before bought Neff stock.

33.    The next day, Acord transferred $300,000 to the Client Account from another securities brokerage account the client owned. Acord used these funds to purchase 52,684 additional shares of Neff stock for the Client Account over the next seven days. Acord's largest purchase of Neff shares for the Client Account (20,000 shares) occurred on April 6, 2005, one day before the acquisition announcement.

34.    Following the acquisition, Acord exchanged the 2,200 Neff shares in his personal account for a profit of $7,719. Acord also exchanged the 54,784 Neff shares in the Client Account for a profit of $146,572.

35.    Growney also traded in Neff stock. On March 23, 2005, amidst the due diligence assistance he and Acord were providing Neff, Growney made his first-ever purchase of Neff stock when he bought 3,000 shares in one of his brokerage accounts. Six days later – the same day Neff's Director of Financial Reporting told him about the Odyssey deal – Growney bought an additional 400 shares in another brokerage account. Finally, on April 1, 2005, six days before the acquisition announcement, Growney purchased an additional 250 shares in a third brokerage account.

36.    Following the acquisition, Growney sold his Neff stock for a profit of $12,954.

## C.  Insider Trading by Alberto and Jose Perez

37.     Alberto and Jose Perez are long-time friends and business associates of Neff's CEO and his two brothers, Jorge Mas and Jose Mas, both former Neff directors.  The Perezes' relationship with the Mas brothers dates back more than 20 years to when their fathers co-founded the predecessor company to Neff.

38.     For more than five years, Alberto Perez has managed real estate projects the Mas brothers own.  He also serves as an officer for one their companies, has signatory authority over several related bank accounts, and is a partner in at least one of their real estate projects.

39.     Jose Perez also maintains an ongoing business relationship with the Mas Brothers. For several years, Jose has worked at MasTec, Inc. a publicly-traded company the Mas family controls.  He also previously worked at Neff.

40.     As a result of their close friendships and business relationships with the Mas brothers, the Perezes are in almost daily contact with them about business and personal matters. During the Odyssey negotiations, Alberto Perez communicated with Juan Carlos Mas almost on a daily basis concerning the real estate projects he managed for the Mas brothers.  Furthermore, Juan Carlos Mas routinely entrusted confidential information to Perez in connection with these projects and other business interests.

41.     Several months before the Odyssey/Neff negotiations began, Neff's CEO gave Alberto Perez an office at Neff's headquarters to facilitate their frequent business meetings.  The office was located on the executive floor among the offices of Neff's senior management.  Perez used this office regularly during the Odyssey negotiations and while Odyssey conducted due diligence at Neff's headquarters.

8

42.     During the negotiations, Alberto Perez met with Neff's CEO almost daily, and communicated regularly with several other Neff managers close to the negotiations, including Neff's general counsel and several regional vice-presidents.  Because of his close business relationship with Neff's CEO, Perez had unrestricted access to Neff's headquarters, including the CEO's office where the CEO kept a "deal file" in an unsecured location.  In addition, documents relating to the deal were often sent to Perez's assistant's fax machine, where he had ready access to them.

43.     Alberto Perez's office at Neff was two doors down from a conference room used by the due diligence teams visiting Neff's headquarters during the first two weeks of March 2005.  During this time, at least 20 outsiders were working in the conference room on the deal at any given time.  Moreover, the due diligence teams had to walk past Alberto Perez's office each day to reach the conference room.

44.     Through this constant access to confidential information about the Neff-Odyssey deal, Alberto Perez learned the acquisition was pending.  He then told his brother Jose Perez about the transaction.  Alberto and Jose are extremely close, and talk several times a day by phone.  Alberto Perez gained or expected to gain a personal benefit by providing this valuable information to a close relative.

45.     The Perez brothers jointly owned a securities brokerage account that they had opened to deposit an $800,000 inheritance from their father.  Both Alberto and Jose Perez traded in the account and talked regularly to their broker.  In fact, on many occasions, the broker discussed the account's trading with both Perez brothers on the phone.

46.     In 2004, the Perezes' account suffered large trading losses.  Between January and October of that year, the joint account lost $151,000.  As of December 2004, the account also

9

had a margin debit balance of $255,000, or 36% of the account's total value. On December 8, 2004, the Perezes' broker wrote them to notify them about the trading losses and the large margin balance, and to warn them about the risks of active trading. As a result, the brothers agreed to slow their trading activity and adopt more of a "buy and hold" investment approach.

47.    Against this backdrop, just two days after the due diligence teams arrived at Neff's headquarters and began working out of the conference room next door to Alberto Perez's office, the Perezes' joint account bought 17,000 shares of Neff stock. This was the first time the Perez brothers had ever purchased Neff stock.

48.    Moreover, just two days earlier, after a half-hour call between Alberto Perez and the broker, the brothers' account began selling a large amount of recently-acquired shares in MasTec. The brothers used the proceeds from these sales to buy Neff stock.

49.    During the next few weeks, the Perezes continued selling MasTec stock and using the money to buy Neff shares. In all, the joint account bought $282,000 of Neff stock in March 2005, the largest position in a single company the brothers had ever taken.

50.    Following the acquisition, the Perezes exchanged 83,000 Neff shares for a profit of $399,000.

### D.  Insider Trading by De La Maza

51.    De La Maza's daughter, Vivian Mas, has been married to Neff's CEO for more than 14 years and has two young children. De La Maza and his wife are extremely close to their daughter and her family. They live only seven miles from their daughter's home and regularly provide childcare to their young grandchildren. As a result, De La Maza and his wife visit their daughter several times weekly, and speak to her numerous times a day by telephone.

52.    Vivian Mas learned about the Odyssey-Neff negotiations from her husband in

February or March 2005, around the time that Odyssey and Neff executed a letter of intent for $470 million and Odyssey began due diligence at Neff's headquarters.

53.     At the same time, De La Maza and his wife were having frequent conversations with their daughter about an upcoming cruise the families were scheduled to take, and whether the Neff CEO's busy schedule would preclude the daughter's family from going. On March 22, 2005, De La Maza's daughter decided to make the final down payment on a cabin for her family, but told her parents her husband still might not be able to go.

54.     Through his constant contact with his daughter, De La Maza learned of the Odyssey-Neff negotiations. On March 16, 2005, he made his first purchase of Neff shares. Prior to this purchase, he had not bought Neff stock in more than three years.

55.     Between March 16 and April 4, 2005, three days before the acquisition announcement, De La Maza bought Neff stock 14 times, purchasing 23,800 shares for $111,000. In contrast, in the previous year De La Maza had made no trades in his wife's IRA, only a handful of trades in a joint account, and averaged less than one transaction a month in his IRA.

56.     Following the acquisition, De La Maza exchanged the Neff shares for a profit of $84,000.

### E.  Insider Trading by Borell

57.     Borell is a long-time friend of Jose Mas, a Neff director during the acquisition negotiations and a brother of Neff's CEO. Borell and Mas have known each other for more than six years. In addition, their wives are close friends, and their children attend the same school and are close friends.

58.     Borell and Mas see each other frequently at their children's school functions, sporting events, and birthday parties. Borell and his wife also socialize with Mas and his wife.

They have often been guests at each other's homes for dinners and parties, and they attend the same church.

59.    Moreover, Borell and his family have been guests of Mas at his vacation home in the Bahamas. Their families have also vacationed together annually for years with ski trips to Colorado and visits to Walt Disney World in Orlando, Florida. During these various social events and vacations, Borell, Mas, and their wives have frequently discussed personal and family matters.

60.    Between March 10 and March 13, 2005, during the height of the acquisition negotiations, the Borell and Mas families traveled to Walt Disney World (with others). The families stayed at the same hotel and socialized and dined together.

61.    Eleven days later, between March 24 and April 1, 2005, Borell's family traveled with the Mas brothers and their families and others to Vail, Colorado. All of the families stayed at the same resort and socialized and dined together.

62.    As a result of his close relationship and frequent contacts with Jose Mas, Borell had access to confidential information about the Neff-Odyssey acquisition negotiations.

63.    In mid-January 2005, Borell transferred approximately $1 million from his client trust account to his personal brokerage account. Several weeks later, on Monday, February 28, 2005 – the day the due diligence teams arrived at Neff's headquarters – Borell began buying Neff stock. At the time, he had borrowed more than $250,000 from various relatives, which he was attempting to repay.

64.    During the ensuing week, Borell purchased 59,000 Neff shares. In the five weeks between February 28 and April 4, 2005 – three days before the acquisition announcement – Borell purchased 300,000 shares of Neff stock at a cost of more than $1.3 million. Before this,

12

Borell had bought Neff stock only one other time, in 1999, which he sold for a loss of approximately $4,000.

65.     Furthermore, Borell purchased the majority of his Neff stock – 178,000 shares – during his vacations with Jose Mas. While at Walt Disney World between March 10 and March 13, 2005, Borell called his broker in Miami 20 times and purchased 6,100 shares of Neff stock. During the nine-day Colorado ski trip between March 24 and April 1, 2005, Borell called his broker more than 50 times and purchased 171,894 shares of Neff stock.

66.     In the weeks following the acquisition announcement, Borell sold his Neff stock for a profit of $974,859.

## VI.  VIOLATIONS

### Count I – Violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] And Rule 10b-5 [17 C.F.R. § 240.10b-5]

67.     The Commission repeats and realleges Paragraphs 1 through 66 of this Complaint as if fully set forth herein.

68.     Acord and Growney knew or were extremely reckless in not knowing they possessed material, non-public information about the possible acquisition of Neff. On the basis of this material, non-public information and in breach of their fiduciary duty or similar duty of trust and confidence to Neff and its shareholders, Acord and Growney purchased shares of Neff stock.

69.     Alberto Perez knew or was extremely reckless in not knowing he possessed material, non-public information about the possible acquisition of Neff. In breach of his duty of trust and confidence to Neff's CEO, he disclosed the information to Jose Perez. On the basis of this material, non-public information, Alberto Perez purchased shares of Neff stock.

13

70.     Jose Perez knew or was extremely reckless in not knowing he possessed material, non-public information about the possible acquisition of Neff. On the basis of this material, non-public information, Perez purchased shares of Neff stock.

71.     De La Maza knew or was extremely reckless in not knowing he possessed material, non-public information about the possible acquisition of Neff. On the basis of this material, non-public information and in breach of his duty of trust and confidence to his daughter, De La Maza purchased shares of Neff stock.

72.     Borell knew or was extremely reckless in not knowing he possessed material, non-public information about the possible acquisition of Neff. On the basis of this material, non-public information and in breach of his duty of trust and confidence to Jose Mas, Borell purchased shares of Neff stock.

73.     By their conduct described above, the Defendants, directly and indirectly, by use of the means or instrumentalities of interstate commerce, or of the mails in connection with the purchase or sale of securities, knowingly, willfully or recklessly: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices, or courses of business which operated as a fraud or deceit upon other persons.

74.     By reason of the foregoing, the Defendants directly or indirectly, violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5. Unless enjoined, they are reasonably likely to continue to violate the securities laws.

## VII.  PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court:

### I.

Permanently restrain and enjoin the Defendants and their agents, servants, employees, representatives, attorneys-in-fact, and assigns and those persons in active concert or participation with them, and each of them, from violating Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Exchange Act Rule 10b-5, 17 C.F.R. § 240.10b-5.

### II.

Order each Defendant who purchased and sold Neff securities on the basis of material, non-public information to disgorge his trading profits from each illegal trade, including prejudgment interest thereon.

### III.

Order each Defendant to disgorge all profits, including prejudgment interest thereon, realized by (i) the persons to whom that Defendant unlawfully communicated material, non-public information, and (ii) the person who traded while in possession of material, non-public information learned as a result of that Defendant's unlawful communication of material, non-public information.

### IV.

Order each of the Defendants to pay a civil money penalty pursuant to Section 21A of the Exchange Act, 15 U.S.C. § 78u-1.

### V.

Issue an Order pursuant to Section 21(d)(2) of the Exchange Act, 15 U.S.C. § 78u(d)(2), barring Defendant Acord from acting as an officer or director of any issuer that has a class of

securities registered pursuant to Section 12 of the Exchange Act, 15 U.S.C. § 78l, or that is required to file reports pursuant to Section 15(d) of the Exchange Act, 15 U.S.C. § 78o(d).

## VI.

Grant such other relief as this Court may deem just and appropriate.


Dated:  July 17, 2009                              Respectfully submitted,

                                                   Scott Masel
                                                   Florida Bar No. 007110
                                                   Senior Trial Counsel
                                                   (305) 982-6398 (direct dial)
                                                   (305) 536-4154 (facsimile)
                                                   masels@sec.gov
                                                   *Lead Counsel for Plaintiff*

                                                   Andre Zamorano
                                                   Senior Counsel
                                                   Florida Bar No. 0967361
                                                   Telephone: (305) 982-6324 (direct dial)
                                                   Facsimile: (305) 536-4154
                                                   zamoranoa@sec.gov.

                                                   *Attorneys for Plaintiff*
                                                   U.S. Securities and Exchange Commission
                                                   801 Brickell Avenue, Suite 1800
                                                   Miami, Florida 33131