IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

FILED by _RoS_ D.C.

OCT - 6 2009

STEVEN M. LARIMORE
CLERK U. S. DIST CT
S. D. of FLA. – MIAMI

SEC,

      Plaintiff,

vs.                                   Civil Case No.:  09-21977-CIV-JORDAN/MCALILEY

KEVAN ACCORD, et. Al.,

      Defendants,

_____/

MEMORANDUM OF LAW IN SUPPORT OF
MOTION TO DISMISS

RE: Thomas BORELL

TABLE OF CONTENTS

PAGES

INTRODUCTION………………………….................................................................... 1

I.      FACTS NEED TO PROVE MISAPPRPRIATION…………………………….... 1

II.     BORELL'S FACTUAL BACKGROUND…………………………….................... 1

III.    WHAT HAS THE SEC ACTUALLY ALLEGED……… ……………………....... 3

IV.     WHAT HAS THE SEC FAILED TO ALLEGE…………………………….......... 3

V.      SEC COMPLAINT INSUFFICIENT……………………………......................... 4

VI.     STANDARD OF REVIEW…………………………….................................... 4

VII.    FACTULA ALLEGATIONS MUST BE PLAUSIBLE AND UNEQUIVOCAL
        IN ORDER TO SURVIVE A MOTION TO DISMISS…………………………… 5

VIII.   THE SEC'S FACTUAL ALLEGATIONS ARE NEITHER
        PLAUSIBLE NOR EQUIVOCAL…………………………….......................... 7

        A.  WHY ARE THERE NO ALLEGATIONS THAT BORELL
            EVER "GAINED ACCESS" TO MATERIAL
            NONPUBLIC INFORMATION…………………………….......................... 7

        B.  WHY ARE THERE NO ALLEGATIONS THAT BORELL
            DECEIVED A "SOURCE'…………………………….......................... 9

IX.     MISAPPROPRIATION REQUIRES RULE 9 PLEADING REQUIREMENTS
        BE MET……………………………...................................................... 10

        A.  RULE 9 PLEADING REQUIREMETNS NOT SATISFIED BY THE
            AMENDED COMPLAINT…………………………….......................... 10

        B.  THE WHO, WHAT, WHEN, WHERE AND HOW ARE NOT
            ANSWERED AS TO ANY DUTY TO A "SOURCE"…………………………….... 11

X.      THE RECENT SEC V. CUBAN DECISION AND IT'S IMPACT……………………… 12

XI.     RULE 10B5-2 VIOLATIONS CAN NOT BE THE BASIS FOR
        A MISAPPROPRIATION THEORY CAUSE OF ACTION……………………………. 13

CONCLUSION……………………………................................................................... 14

TABLE OF AUTHORITIES

CASES

Ascroft v. Iqbal, 129 S. Ct. 1936 (2009)…………………………….......................   2, 5, 6, 9, 11

Bell Atlantic v. Twombly, 550 U.S. 544 (2007)…………………………….............   2, 5, 6

Craftmatic Sec. Litig, v. Kraftsow, 890 F 2d. 628 (3rd Cir. 1989)……………………   10

SEC v. Cuban, Civil Action, No.: 3:08-CV-2050-D (N.D. Texas July 17, 2009).....   9, 12, 13, 14

Trainal v. Coca-Cola, Case No.: 06-15851 (11th Cir. 2009)......................................   2, 5, 6

United States v. O'Hagan, 521 U.S. 642 (1997)……………………………..............   9

Wagner v. Wells, Case No.: 05-14365 (11th Cir., 2006)……..……………...............   10

FEDERAL STATUTES AND REGULATORY MATERIAL

15 U.S.C. Sec. 78 j(b), Section 10 (b)……………………………….......................   1, 12, 13, 14
17 C.F.R. Sec. 240.10b-5.………………………………...........................................   1, 12, 13, 14

RULES

Federal Rule of Civil Procedure 8………………………………...............................   2, 4,  7, 8, 10
Federal Rule of Civil procedure 9………………………………...............................   4, 10
Federal Rule of Civil Procedure 12………………………………............................   4

Misc.

Eleventh Circuit Pattern Jury Instructions (2005)………………………………...........   1

## INTRODUCTION

Defendant, Borell vigorously disputes many of the facts plaintiff has plead but Borell will show that even if the SEC's well-pled factual allegations are assumed as true , for purposes of this motion only,  the amended complaint is not entitled to the privilege of surviving a motion to dismiss.

I.      What facts does the SEC have to allege to state a claim for misappropriation?

II.     What has the SEC actually alleged?

III.    What has the SEC failed  to allege?

I.

## FACTS NEEDED TO PROVE MISAPPROPRIATION

The 11th Circuit's  Jury Instructions provides:

"[Under the "misappropriation theory" of insider trading, a person commits fraud in connection with a securities transaction, and thus violates Rules 10b-5(a) and 10b5-1, when he/she  misappropriates material and confidential information for securities trading purposes in breach of a duty owed to the source of the information. Under that theory, a fiduciary's undisclosed, self-serving use of a principal's information to purchase or sell securities in breach of a duty of loyalty and confidentiality defrauds the principal of the exclusive use of that information"…………………………….....................................................................

II.

## BORELL'S VERSION OF THE FACTS (ALTERNATIVE EXPANATIONS)

Borell's, is representing himself in this motion and although an attorney, Borell is not a "Federal Court litigator" and in advance apologizes if he makes any unintentional errors under local rules.

Borell is of the understanding that he is not permitted to attack the veracity of  the SEC's factual allegations. Borell will therefore limited his arguments herein to purely legal arguments, any of the inferences that can be inferred from the plaintiff's allegations and suggestions concerning  "alternative explanations that do not involve misconduct"  that are required for review of this motion under IQBAL.

1.  The Sec did not allege that Borell  acted other than totally consistent with his trading patterns and strategies in regards to the Neff purchases.

2. It was public knowledge that Neff had always been the speculation of take-over rumors and had had at least three take-overs fall apart in recent years (prior to April to 2005).

3. Is it insider trading to put two and two together?  For example:

   a. If a trader (without a fiduciary duty) hears that a CEO is buying a 130 foot yacht can a trader not assume the CEO is expecting a big pay day?

   b. If this same trader later hears that the same CEO is buying expensive vacation homes can not the trader assume that the CEO is expecting a big pay day.

   c. If the same trader hears that this same CEO is on a spring break ski vacation, but that this CEO is not skiing…and the CEO's stock  has been up on "no news", can not the trader assume the that something has to be up, especially when the CEO's company was continually a buy-out candidate?

There are numerous alternative explanations for Borell's purchases of Neff that do not allow any assertion that Borell is liable for misapprpriation, and under the holdings of IQBAL, TWOMBLY and this Circuit's recent decision in TRAINAL, no allegation of  misconduct can possibly be "nudged over the line from possible to plausible", if there exists  "alternative explanation(s) that do not involve misconduct" as is the case herein.

As the Eleventh Circuit stated in TRAINAL:

> " More recently, In Iqbal, the Supreme Court reiterated  that although Rule 8 of the
> Federal Rules of Civil Procedure does not require detailed factual allegations, it does
> demand "more than an unadorned, the-defendant-unlawfully-harmed me-accusation…..
>
> A complaint must state a plausible calim for relief, and "a claim has facuial plausibility
> when the plaintiff pleads factual content that allows the court to draw the reasonable inference
> that the defendant is liable for the misconduct alleged….
>
> The mere possibility the defendant acted unlawfully is insufficient to survive a motion to
> dismiss……The well-pled allegations must nudge the calim "across the line from conceivable to
> plausible"…

2

III.

## WHAT HAS THE SEC ACTUALLY ALLEGED?
(that is plausible not merely possible)

The SEC's amended complaint stripped of it's conclusory flourishes, only manages to allege in it's "Factual Allegations",  Section V (E)., but one item that needs to be alleged:

1. Only that Borell purchased stock.

IV,

## WHAT HAS THE SEC FAILED TO ALLEGE?

The SEC's amended complaint stripped of it's conclusory flourishes, in it's "Factual Allegations", Section V (E),  fails to allege among many other items:

1. Any allegation that Borell "learned of" of "gained access to" or "was told of" any material nonpublic information.

2. Any allegation that a "source" (or Jose Mas) transferred any material nonpublic information (or any confidential information for that matter) to Borell.

3. Any allegation that a  Borell deceived any "source" or Jose Mas.

4. Any allegation that Borell owed any "source" or Jose Mas any duty.

5. The volume of trading by Borell was in any way "unusual for Borell", as the SEC must so allege.

6. The volume of phone calls between Borell and his broker was in any way "unusual  for Borell", as the SEC must so allege.

7. That Borell and any "source" (or Jose Mas) ever shared business confidences.

8. Any allegation of any improper act, or violation of  any law, rule, code, etc.  by Borell (in any area).

9. Any allegation that Borell did not have the absolute right to do any action alleged including but not limited to the transfer of funds.

3

V.

### THE SEC'S AMENDED COMPLAINT IS A SHOTGUN COMPLAINT THAT WAS DRAFTED IN A DELIBERATELY CONFUSING MANNER TO MASK IT'S INSUFFICIENCY OF BOTH FACT AND LAW.

The deliberate, confusing, non-sequential and "shotgun" manner the SEC chose to lay out the amended complaint, could easily lull an untrained reader on first perusal, to come away thinking that at least one of the nine (9) above referenced items were actually alleged in SEC's "Factual Allegations" (Section V (E), paragraphs 55-67).

Indeed, not one of the above referenced "9" items is actually alleged in the section entitled "Factual Allegations", section V (E). .

Regrettably, in spite of this inability to actually allege a cause of action or allege, the SEC chose instead to include Borell in a lawsuit with five others and forever tarnish his name and subject Borell to the harm(s) that Rules 8 and 9 were created to protect.

Borell holds no animosity towards the SEC or it's attorneys. Hopefully after reviewing this motion the SEC will see fit to dismiss this action on it's own volition and close this matter.

VI.

### STANDARD OF REVIEW

When ruling on a motion to dismiss under Rule 12 (b) (6), a court must determine "whether as a matter of law, the allegations of the complaint.....are sufficient to state a claim upon which relief may be granted." When reviewing a complaint under this standard neither the court nor the defendant may dispute plaintiff's factual allegations (however doubtful).

However, when ruling on a motion to dismiss neither the court in it's analysis nor a defendant in his legal argument are required to accept as true:

1. any conclusions of law, nor

2. unwarranted deductions of fact, nor

3. factual allegations that are not well pled

4

VII.

## FACTUAL ALLEGATIONS MUST BE "PLAUSIBLE" AND "UNEQUIVOCAL" IN ORDER TO SURVIVE A MOTION TO DISMISS
(Rule 8)

### ASHCROFT v. IQBAL

Having already briefly quoted from the Eleventh Circuit's decision in TRAINAL, herein follows a more

detailed discussion as to what the U.S. Supreme Court has recently held in regards to what a plaintiff needs

to allege to survive a motion to dismiss.

The May 18, 2009 decision of the Supreme Court in ASHCROFT V. IQBA, 556 U.S. --, 129 S. Ct.

1937, 1949 (2009) makes clear that the TWOMBLY pleading standards apply to all Federal civil cases.

> "To survive a motion to dismiss under Rule 8,  a complaint must contain sufficient factual matter, accepted as true for purposes of  the motion, to "state a claim to relief that is plausible on its face".....
>
> A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged......
>
> Where a complaint pleads facts that are "merely consistent with " a defendant's liability, it "stops short of the line between possibility and plausibility  of entitlement to relief".

The Court went on the discuss  it's decision in  TWOMBLY:

> "Two working principles underline our decision in TWOMBLY.
>
> First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.... (Although for the purposes of a motion to dismiss we must take all of the factual allegations in the complaint as true, we "are not bound to accept as true a legal conclusion couched as a factual allegation")......
>
> Rule 8........does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.....
>
> Second, only a complaint that states a plausible claim for relief survives a motion to dismiss where the well-pleaded facts do not permit the court to infer more that the mere possibility of misconduct, the complaint has alleged-but it has not "shown"-that the pleader is entitled to relief."

The Court further explained that whether a complaint sets out a plausible claim for relief is content-

specific. Thus IQBAL directs the lower courts to read complaints closely and to parse allegations to

determine whether a "plausible" claim is in fact pleaded.

"...but where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged--but it has not "shown"--that the pleader is entitled to relief.

In keeping with these principals a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth.

While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations......When there are well pleaded factual allegations , a court shoud assume their veracity and then determine whether they plausibly give rise to an entitlement to relief."

## TWOMBLY DECISION

As stated, the TWOMBLY decision insists that a complaint must allege facts that render the liability asserted "plausible". Id at 114. Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact). Id at 1965.

What has become apparent then is that a Court must read Rule 8 (a) (2) to not only require that the facts plead state a claim, but that the  facts pled demonstrate the plausibility of a claim. Such a system of plausibility pleading requires that the complaint set forth facts that are not merely consistent with liability; rather, the facts must demonstrate "plausible entitlement to relief". Id at 1965.

Thus, a plaintiff may no longer survive a motion to dismiss if they plead facts that are equivocal, meaning the allegations are consistent both with asserted illegality and with an innocent alternate explanation. Indeed the Court in Twombly expressly stated that allegations that are "merely consistent with" liability leave only a depiction that "stays in neutral territory" and "stops short of the line between possibility and plausibility". Id at 1966.

No longer may a court allow plaintiffs the benefit of inferences in their favor when the facts pleaded are consistent with alternative explanations that do not involve wrongdoing. Id at 1966. The Court described three zones of complaint into which  one's complaint may fall, with the third alone being sufficient to survive a motion to dismiss.  The first zone consists of largely conclusory pleading The second zone consists of factually neutral pleading. The third zone consists of factually suggestive pleading. Only those complaints that plead facts suggestive of liability satisfy the Rule 8 (a) obligation to state a claim that shows entitlement to relief. Id at 1966.

Plaintiff must cross the two thresholds between the three zones to have stated a claim for relief. First is the threshold between conclusory and factual pleading that supports the possibility of a claim but could also support a scenario not involving liability. The second threshold is between such a "factually neutral" pleading and the "factually suggestive," the latter moving the claim from being merely possible to plausible.

In other words, simply offering a complaint that sets forth facts that render liability possible must be treated as insufficient."

6

Herein, the SEC allegations, do not approach the requirement that they be more than just possibilities. As such any such inferences are nothing more than at best, equivocal and by definition can never cross the line from possible to plausible, under TRAINAL, IQBAL and TWOMBLY.

There are a multitude of alternative explanations as to Borell's purchases of Neff that do not allow any inference of wrongdoing. In fact the SEC's allegations (lack thereof) support the inference that Borell acted no differently than he always did. No unusual trading allegations, no unusual phone calls, no unusual money transfers (remember the test would be "unusual for Borell specifically"). Quite sure if any active trader's actions are looked at as a "snapshot" that it may appear unusual, but what is unusual for the average person is not proper inquiry, the proper inquiry would be is something unusual for "the specific Trader/Borell ". The SEC has not met it's burden to alleging a complaint that nudges what it "alleges" Borell allegedly did across the line from perfectly legal behavior for which no liability attached to that of misconduct or illegality. The SEC's amended complaint does not survive the IQBAL analysis.

VIII

THE SEC'S FACTUAL ALLEGATIONS ARE "NOT PLAUSIBLE"

VIII A.   WHY ARE THERE NO ALLEGATIONS THAT MATERIAL NONPUBLIC INFORMATION WAS ACTUALLY "GAINED BY BORELL"?

The SEC bears ASHCROFT/TWOMBLY burdens, under Rule 8, to allege something more than the possibility of a claim. The SEC must allege/show that it's claim is "plausible".

Accordingly, in this type of case the SEC could never state a cause of action absent allegations of:

1.   The transfer of material nonpublic information from a source to a trader, plus

2.   A duty to the source of material nonpublic information by the trader not to trade, plus

3.   A deception of the source (fraud/deception as to a source) by the trader.

A complaint must contain all three allegations to survive a motion to dismiss. See O'HAGAN and CUBAN. As the famous ad that ran a few years back stated; ....."Where's the beef?"......"Where's any allegation that Borell "obtained information"?

1.      Did Borell steal any information? ................................not alleged.

2.      Did Borell obtain information by promise as in CUBAN?... .not alleged.

3.      Was Borell an employee of "source"/Neff?......................not alleged

7

The SEC had no problem is at least alleging that the other five other defendants "possessed "something",

whether it be material/nonpublic or otherwise.

### ACCORD & GROWNEY

24. E-mails about ramifications if ownership changes   (Accord and Growney)
25. E-mail regarding "if transaction materializes (Accord only)
26. Contacted by purchaser (Accord and Growney)
27. Time slips regarding due diligence (Accord and Growney)
28. Time slip regarding due diligence (Accord only)
29. E-mail regarding closing date (Growney only)
30. E-mail regarding closing date (Growney only)
31. E-mails and calls regarding the acquisition (Growney only)
35. Growney was "told" about the deal (Growney only)

### ALBERTO AND JOSE PEREZ

44. Alberto Perez "learned" the acquisition was pending.
44. Alberto Perez "told" his brother Jose Perez about the transaction.

### DE LA MAZA

54. De La Maza "learned" of the acquisition.

### BORELL

62. As a result of his close relationship and frequent contacts with Jose Mas, Borell had access to confidential information about the Neff-Odyssey negotiations.

Access? .............Access? .................even taking this allegation as true for purposes of this motion

(however doubtful), Borell is being sued for what? Access?....without also alleging "gained access"?

This is not what the law is or what paragraph 72 asserts. Is this some new theory? Does "possession of

material nonpublic information" now equal "access to confidential information"? What is wrong with the

following equation?

Is the following equation true or false?

Possession of material nonpublic information  = access to confidential information

Under this standard….."access without alleging gaining access thereto".... the SEC would

have license to sue anyone for insider trading and could place anyone in a position of facing and/or be

forced into personal, financial and professional ruin, as has been the case with Borell.

8

It is respectfully submitted that in the absence of the SEC having plead a "plausible" and unequivocal" well-plead factual allegation that Borell ever "learned of" or was "told of" material nonpublic information, this amended complaint was DOA under Rule 8.

### VIII B.   WHY ARE THERE NO ALLEGATIONS THAT BORELL DECEIVED A "SOURCE"?
(a necessary allegation as this is a lawsuit for the deception of a "source')

Without some testimony or corroboration from a "source", there is no case that can be brought for misappropriation. See O'HAGAN and CUBAN. Without more, at worst any actions by a trader (Borell) could only be seen as being what the IQBAL referenced as "equivocal" (consistent with both liability and non-liability, actually only consistent with non-liability) and therefore stopping short of the line between possibility and plausibility and not satisfying Rule 8 and mandating that this case be dismissed.

Surely the SEC has taken testimony from all potential "sources"? The SEC is suing Borell for deceiving a "source" right? Isn't the "source" who was harmed, opinion important? Why did the SEC decide to not include in it's factual allegations a proffer that some "source" feels wronged by Borell?

1.      Is it that there is no statement?....... If there is no statement from a "source" then the SEC

suit is built upon pure speculation and the SEC had no right to sue Borell……………………..
…………..and this amended complaint must be dismissed.

2.      If there is a statement from a "source" and the statement says something to the effect that Borell

never deceived that "source", then likewise no lawsuit should have been filed against Borell….
…………… and the amended complaint must be dismissed.

3.      Finally, if there is a "source" who has stated that he/she/it was deceived by Borell, then that

statement is required to be alleged in the amended complaint as it is a necessary allegation that
has to be plead in the complaint…………since no such statement has been alleged the amended
complaint must be dismissed.

If there really is a statement from a "source" why hide it? Does that statement defeat the SEC's cause of action in and of itself? Does not the SEC have an obligation to allege in a complaint for misappropriation an allegation as to whether a "source" (for example; Jose Mas) agrees with the SEC's position" that Borell deceived the "source"?

The only exception would be if it was being alleged that Borell stole information. If that is the case the amended complaint must be dismissed until that is ever alleged. As such no claim as to breach of duty has been alleged under Rule 8.

The SEC's amended complaint not only cannot survive a motion to dismiss but was DOA prior to being filed on July 17, 2009.

IX.

MISAPPROPRIAIOTN REQUIRES RULE 9 PLEADING REQUIREMENTS BE MET

The Eleventh Circuit in WAGNER v. WELLS, Case No.: 05-14365, recently set out what Rule 9 requires, the court stated:

> Rule 9(b) requires that, "in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." The rule requires this particularity in order to "alert defendants to the precise misconduct with which they are charged and to protect defendants against spurious charges of immoral and fraudulent behavior."
>
> To satisfy Rule 9 (b) a plaintiff must allege the "who," "what," "where," "when," "and "how" of any fraudulent activity that plaintiff needs to plead to survive a motion to dismiss.
>
> Conclusory allegations are insufficient because they do not state the circumstances constituting fraud with particularity. Craftmatic Sec. Litig. V. Kraftsow, 890 F 2d. 628, 645 (3rd Cir. 1989). Put simply as described above , Rule 9 (b) requires a plaintiff to "inject precision and some measure of substantation into the allegation of fraud......who, what, when, where and how.

A.   RULE 9 PLEADING REQUIREMENTS NOT SATISFIED BY THE AMENDED COMPLAINT
(Deception/fraud is element of claim)

What violations of law has the SEC actually alleged Borell is liable for that are subject to Rule 9? Has the SEC plead facts sufficiently and with particularity?

Paragraphs 72 and 73 entitle Violations sets out what the SEC is seeking to prove.

72.   Borell knew or was extremely reckless in not knowing he possessed material, non-public information about the possible acquisition of Neff. On the basis of this information and in breach of his duty to Jose Mas, Borell, purchased shares of Neff.

73.   By their conduct described above, the Defendants, directly and indirectly, by use of the means or instrumentalities of interstate commerce, or the mails in connection with the purchase or sale of securities, knowingly, willfully or recklessly:

    A.   employed devices, schemes, or artifices to defraud;
    B.   made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
    C.   engaged in acts, practices, or courses of business which operated as a fraud or deceit upon other persons.

10

These allegations are not factual allegations but legal allegations. But and even if paragraphs 72 and 73

were factual allegations they would be violate of not only Rule 9 but Rule 8.

As the Eleventh Circuit stated in TRAINAL:

> " More recently, In Iqbal, the Supreme Court reiterated  that although Rule 8 of the
> Federal Rules of Civil Procedure does not require detailed factual allegations, it does
> demand "more than an unadorned, the-defendant-unlawfully-harmed me-accusation…..

B.      THE WHO, WHAT, WHEN, WHERE AND HOW ARE NOT ANSWERED AS TO
ANY DUTY TO A "SOURCE" (JOSE MAS)

Again, lets go through the exercise contrasting what was plead as to the other five defendants in the

amended complaint as to "duty".

1.   Accord &  Growney:   Obviously, the two as "insiders" owe automatic duties to their "source".

2.   As to the Perez brothers, SEC alleges  that the [source] and the brothers shared:

  A.   shared personal, family and business confidences "with their source"
  B.   had in times past been fiduciaries "with the source"

3.   As to De La Maza, they allege they family tie that may impose a rebuttable duty

As for Borell, the SEC only alleged that Borell and Mas  shared "personal and family matters". The SEC

conspicuously chose not to allege that Borell and Mas shared "business confidences" as the SEC alleged

with the Perez brothers and the accountants, Accord and Growney.

Once again, it is what the SEC chose not to allege, or rather could not allege (who, what, where, when &

how) that makes one wonder. The absence of alleging that Borell and Mas shared "business matters" was

not an oversight on the part of the SEC.

As with the discussion on whether a statement was given by Jose Mas or any other "source", if no

statement taken----no suit could be brought. If a statement was taken, it has to be alleged in the lawsuit to

properly state a claim. If a statement was taken and the information garnished exonerates Borell, the suit

should never have been brought.

In any event, even if the SEC has alleged the sharing of "business confidences" it would not be enough

to  raise a plausible allegation of fiduciary-like duty of trust and confidence.

It is respectfully submitted the absence of  somewhere in the body of the amended complaint factual

allegations the SEC actually plead a "plausible" and unequivocal" well-pled allegation that Borell owed a

duty to the "source" of this material nonpublic information, with requisite particularity as to who, what, when, where and how, required under Rule 9 renders the amended complaint is DOA. Suffice to say, the SEC has failed to sufficiently plead/allege breach of any duty under Rule 8 and/or Rule 9.

X.

THE RECENT CUBAN DECISION & IT'S IMPACT

SECTION 10B-5 VIOLATIONS
(Pleading requirements)

The very week that Plaintiff filed it's original complaint and the very day the amended complaint was filed a District Court in Texas dismissed a misappropriation action against Mark Cuban. The opinion, attached hereto is instructive on two fronts See SEC v. CUBAN, Civil Action, No.: 3:08-CV-2050D (N.D. Texas, July 17, 2009)

A. First, CUBAN sets out what the that SEC must actually allege;  essentially the court's ruling was that that once it is alleged that material nonpublic information was transferred from a "source" to a  "trader" ( the first prong), that the SEC has to allege that the trader breached a "duty to the source" (the second prong). In the CUBAN case the breach of duty at issue "was a promise not to trade". The court held that unless the SEC could allege that a trader made a promise not to trade or was bound by a duty not to trade that no claim could be brought for misappropriation.

In the instant lawsuit against Borell, when using the CUBAN rationale, the SEC's amended complaint does not even get past the "first prong"…for….as stated ad nauseum in this motion…the SEC has yet to allege that Borell ever "gained access" to "material nonpublic information", let alone "breached a duty" thereafter.

The import of the CUBAN decision is the obvious:
Whenever one has a misappropriation case it is the "breach of a duty or promise not to trade" after "obtaining material nonpublic information" that is the wrong. The wrong is not making money, but the "breach" to the "source"

B. Secondly, the CUBAN court ruled that he SEC could not pursue a misappropriation action based upon a violation of Rule 10b5 (1,2 and 3).

XI

RULE 10b5-2 VIOLATIONS CAN NO LONGER
BE THE BASIS FOR A MISAPPROPRIATION THEORY LAWSUIT

The court in Cuban ruled that the SEC may not use Rule 10b5 as a basis to establish liability under

Section 10 (b) and Rule 10b-5.

As more specifically set out below Chief Judge Fitzwater ruled that the SEC may not use Rule 10b5 to

charge a trader with misappropriation.

> "The Sec's rulemaking authority under Section 10 (b) is bounded by the statute's proscription of
> conduct that is manipulative or deceptive. The SEC cannot by rule make unlawful conduct that
> does not fall into one of these categories. See O'Hagan, 521 U.S. at 651 ("Liability under
> Rule 10b-5, our precedent indicates, does not extend beyond conduct encompassed by Section
> 10 (b)'s prohibition.")....id. at 655 ("Section 10 (b) is not an all-purpose breach of fiduciary
> duty ban; rather, it trains on conduct involving manipulation or deception." ....In the context of
> the misappropriation theory, the SEC cannot by rule predicate liability on an agreement that

> lacks the necessary component of an obligation not to trade or otherwise use confidential
> information for personal benefit. As the court has explained, it is the undisclosed use of such
> information, in breach of a duty not to use it for personal benefit, that makes the conduct
> deceptive under

> Pertinent portion of Rule 10b5-2b2:

> Whenever the person communicating the material nonpublic information and the person to
> whom it is communicated have a history, pattern, or practice of sharing confidences, such that
> the recipient of the information knows or reasonably should know that the person
> communicating the material nonpublic information expects that the recipient will maintain its
> Confidentiality;".....

> The Court in CUBAN then went on to state:

> "The Court concludes that, by its terms, Rule 10b5-2 (b) (1) attempts to base misappropriation
> theory liability on an agreement that lacks an obligation not to trade or otherwise use
> confidential information. The agreement specified in the Rule---"to maintain information in
> confidence"---relates merely to preserving the confidentiality of the information. The word
> "maintain" captures the obligation to keep the information in its existing state, and the modifying
> phrase " in confidence" indicates that the state to be preserved is its confidentiality. Nothing in
> the Rule 10b5-2 (b)(1) requires that the agreement encompass an obligation not to trade on or
> otherwise use the information.

> That Rule 10b5-2 (b)(1) relates to an agreement to preserve confidentiality is supported by the
> language and design of Rule 10b5-2 as a whole. It accords with the interpretation of Rule 10b5-
> 2(b)(2) and (b)(3), which like (b)(1), specify circumstances in which a duty of trust or
> confidence exists. Rule 10b5-2 (b)(2) creates the duty based on a history, pattern, or practice of
> sharing confidences if "the recipient of the information knows or reasonably should know that
> the person communicating the material nonpublic information expects that the recipient will
> maintain its confidentiality." .........Thus Rule 10b5-2 (b)(2) and (b)(3) also base
> misappropriation theory liability on an undertaking, express or implied, to maintain

13

confidentiality of information, but they do not require an undertaking not to trade on or otherwise use the information for personal benefit.

Because Rule 10b5-2(b)(1) attempts to predicate misappropriation theory liability on a mere confidentiality agreement lacking a non-use component , the SEC cannot rely on it to establish Cuban's liability under the misappropriation theory. To permit liability based on Rule 10b5-2(b)(1) would exceed the SEC's Section 10(b) authority to proscribe conduct that is deceptive. See O'Hagan, 521 U.S. at 651 ("Liability under Rule 10b-5, our precedent indicates, does not extend beyond conduct encompassed by Section 10 (b)'s prohibition.") This is because, as the Court has explained, under the misappropriation theory of liability, it is the undisclosed use of confidential information for personal benefit, in breach of a duty not to do so, that constitutes the deception.

Likewise....if the SEC were to have actually plead sufficient factual allegations/elements of Rule 10b5-2(b)(2) against Borell (which the SEC has yet to do in any event) this alone would not suffice to maintain an action against Borell for the above reasoning oif Judge Fitrzwater. Therefore any claim for violation of Rule under 10b5 can not state a cause of action against Borell and should be dismissed.

## CONCLUSION

Under both controlling law and the decision in SEC vs. CUBAN, the SEC does not (and cannot) adequately plead that Borell either traded Neff shares based upon material nonpublic information not that breached a fiduciary duty or similar duty o f trust and confidence when he purchased Neff stock. In the absence of such a breach, there is no fraud and no insider trading liability. For all of the reasons stated above , defendant, Thomas Borell respectfully requests that the Amended Complaint be dismissed with prejudice.

Once again, defendant made the decision to represent himself in this motion to dismiss and hoefully did not violate any of this Honorable Court's or the Southern District Rules and Procedures.

Rpectfully submitted this 8th day of October, 2009.

Thomas L. Borell
9130 S. Dadeland Blvd.
Suite 1509
Miami, FL 33156
Tel.: 305-670-8182
Fax: 305-670-5596

14



IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

SECURITIES AND EXCHANGE      §
COMMISSION,                  §
                             §
              Plaintiff,     §
                             §  Civil Action No. 3:08-CV-2050-D
VS.                          §
                             §
MARK CUBAN,                  §
                             §
              Defendant.     §

## MEMORANDUM OPINION
## AND ORDER

The dispositive question presented by defendant Mark Cuban's ("Cuban's") motion to dismiss is whether plaintiff Securities and Exchange Commission ("SEC") has adequately alleged that Cuban undertook a duty of non-use of information required to establish liability under the misappropriation theory of insider trading. Concluding that it has not, the court grants Cuban's motion to dismiss, but it also allows the SEC to replead.

I

A

This is a suit brought by the SEC against Cuban under the misappropriation theory of insider trading. The SEC alleges that, after Cuban agreed to maintain the confidentiality of material, nonpublic information concerning a planned private investment in public equity ("PIPE") offering by Mamma.com Inc. ("Mamma.com"),[1]

---

[1]In June 2007 Mamma.com changed its name to Copernic Inc. The court will refer to the company as Mamma.com, by which it was known at all times relevant to this litigation.

he sold his stock in the company without first disclosing to Mamma.com that he intended to trade on this information, thereby avoiding substantial losses when the stock price declined after the PIPE was publicly announced.   The SEC maintains that Cuban is liable for violating § 17(a) of the Securities Act of 1933 ("Securities Act"), § 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), and Rule 10b-5 promulgated thereunder.[2]

According to the SEC's complaint, in March 2004 Cuban purchased 600,000 shares, or a 6.3% stake, in Mamma.com, a Canadian company that operated an Internet search engine and traded on the NASDAQ.  In the spring of 2004, Mamma.com decided to raise capital through a PIPE offering.  As the PIPE offering progressed toward closing, the company decided to inform Cuban, its then-largest known shareholder, of the offering and to invite him to participate.  The CEO of Mamma.com spoke with Cuban by telephone.

> The CEO prefaced the call by informing Cuban that he had confidential information to convey to him, and Cuban agreed that he would keep whatever information the CEO intended to share with him confidential.  The CEO, in reliance on Cuban's agreement to keep the information confidential, proceeded to tell Cuban about the PIPE offering.

---

[2]The court will focus its discussion and analysis on § 10(b) and Rule 10b-5 because the parties agree that § 17(a) is "routinely examined . . . under the same standards" as these provisions.  D. Br. 7 n.6.  *See, e.g., Landry v. All Am. Assurance Co.*, 688 F.2d 381, 386 (5th Cir. 1982) ("Rule 10b-5, adopted under § 10(b) of the Securities and Exchange Act of 1934, is substantially identical to § 17(a).").

Compl. ¶ 14.  As Mamma.com "anticipated," Cuban reacted angrily to this news, stating that he did not like PIPE offerings because they dilute the existing shareholders.  *Id.* at ¶ 15.  At the end of the call Cuban said: "Well, now I'm screwed.  I can't sell."  *Id.* at ¶ 14.  Two internal company emails quoted in the complaint indicate that the executive chairman of Mamma.com may have expected that Cuban would not sell his shares until after the PIPE was announced. *See id.* at ¶ 15 ("[Cuban] said he would sell his shares (recognizing that he was not able to do anything until we announce the equity)[.]"); *id.* at ¶ 20 ("[Cuban's] answers were: he would not invest, he does not want the company to make acquisitions, he will sell his shares which he can not [sic] do until after we announce.").

Several hours after they spoke by telephone, the CEO sent Cuban a follow-up email in which he provided contact information for the investment bank conducting the offering, in case Cuban wanted more information about the PIPE.  Cuban then contacted the sales representative, who "supplied Cuban with additional confidential details about the PIPE."  *Id.* at ¶ 17.  One minute after ending this call, Cuban telephoned his broker and directed the broker to sell all 600,000 of his Mamma.com shares.  The broker sold a small amount of the shares during after-hours trading on June 28, 2004, and sold the remainder during regular trading hours on June 29, 2004.  Cuban did not inform Mamma.com of his intention

- 3 -

to trade on the information that he had been given in confidence and that he had agreed to keep confidential. *See id.* at ¶ 25 ("Cuban never disclosed to Mamma.com that he was going to sell his shares prior to the public announcement of the PIPE."). After the markets had closed on June 29, 2004, Mamma.com publicly announced the PIPE offering. Trading in the company's stock opened substantially lower the next day and continued to decline in the days following. Cuban avoided losses in excess of $750,000 by selling his shares prior to the public announcement of the PIPE. After the sale, Cuban filed the required disclosure statement with the SEC and "publicly stated that he had sold his Mamma.com shares because the company was conducting a PIPE[.]" *Id.*

Based on Cuban's alleged violation of § 17(a) of the Securities Act, § 10(b) of the Exchange Act, and Rule 10b-5, the SEC seeks a permanent injunction against future violations, disgorgement of losses avoided, prejudgment interest, and imposition of a civil monetary penalty.

B

Cuban, supported by five law professors as *amici curiae*, moves to dismiss the complaint under Fed. R. Civ. P. 12(b)(6) for failure to state a claim on which relief can be granted, and under Rule 9(b) for failing to plead fraud with particularity.[3]   Cuban

---

[3]Although Cuban moves to dismiss under Rule 9(b) and addresses that standard in his brief, he does not specify how the SEC's complaint is deficient under Rule 9(b) in any respect that is

maintains that, to establish liability for insider trading, the SEC must demonstrate that his conduct was deceptive under § 10(b), which he asserts the SEC has not done under the facts pleaded. Specifically, Cuban contends that the SEC has alleged merely that he entered into a confidentiality agreement, which is of itself insufficient to establish misappropriation theory liability because the agreement must arise in the context of a preexisting fiduciary or fiduciary-like relationship, or create a relationship that bears all the hallmarks of a traditional fiduciary relationship; the existence of a fiduciary or fiduciary-like relationship is governed exclusively by state law and, under Texas law, the facts pleaded do not demonstrate that he had such a relationship with Mamma.com; even if the court applies federal common law, the facts pleaded still fail to show such a relationship; and the SEC cannot rely on Rule 10b5-2(b)(1) to supply the requisite duty because the Rule applies only in the context of family or personal relationships, and, if the Rule does create liability in the absence of a preexisting fiduciary or fiduciary-like relationship, it exceeds

---

distinct from what he asserts to be lacking under Rule 12(b)(6). To the extent his Rule 12(b)(6) and Rule 9(b) arguments merge, they are discussed together *infra*. Assuming *arguendo* that Cuban relies on a distinct argument to contend that the complaint lacks the particularity that Rule 9(b) requires, the court rejects the argument. Rule 9(b) requires that fraud be pleaded "with particularity," which requires specification of facts analogous to those in "the first paragraph of any newspaper story, namely the who, what, when, where, and how." *Melder v. Morris*, 27 F.3d 1097, 1100 n.5 (5th Cir. 1994). The court holds that the complaint is sufficiently particular to satisfy Rule 9(b).

- 5 -

the SEC's § 10(b) rulemaking authority and cannot be applied
against him.

II

Under Rule 8(a)(2), a pleading must contain "a short and plain
statement of the claim showing that the pleader is entitled to
relief." While "the pleading standard Rule 8 announces does not
require 'detailed factual allegations,'" it demands more than
"'labels and conclusions.'" *Ashcroft v. Iqbal*, ___ U.S. ___, 129
S.Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550
U.S. 544, 555 (2007)).   And "'a formulaic recitation of the
elements of a cause of action will not do.'" *Id.* (quoting *Bell
Atl.*, 550 U.S. at 555).

In deciding a Rule 12(b)(6) motion to dismiss for failure to
state a claim, "[t]he 'court accepts all well-pleaded facts as
true, viewing them in the light most favorable to the plaintiff.'"
*In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir.
2007) (internal quotation marks omitted) (quoting *Martin K. Eby
Constr. Co. v. Dallas Area Rapid Transit*, 369 F.3d 464, 467 (5th
Cir. 2004)).   To survive the motion, a plaintiff must plead "enough
facts to state a claim to relief that is plausible on its face."
*Bell Atl.*, 550 U.S. at 570).   "A claim has facial plausibility when
the plaintiff pleads factual content that allows the court to draw
the reasonable inference that the defendant is liable for the
misconduct alleged." *Iqbal*, 129 S.Ct. at 1949.   "The plausibility

- 6 -

standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.; see also Bell Atl.*, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level[.]"). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'shown'—that the pleader is entitled to relief." *Iqbal*, 129 S.Ct. at 1950 (quoting Rule 8(a)(2) (alteration omitted)).

III

A

Section 10(b) of the Exchange Act makes it unlawful

> for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange— . . . [t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b).

Rule 10b-5, promulgated pursuant to the SEC's § 10(b) rulemaking authority, provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5 (2009).

The law of insider trading is not based on a federal statute expressly prohibiting the practice; it has instead developed through SEC and judicial interpretations of § 10(b)'s prohibition of "deceptive"[4] conduct and Rule 10b-5's antifraud provisions. The SEC, in *In re Cady, Roberts & Co*, 40 S.E.C. 907 (1961), and the Supreme Court, in *Chiarella v. United States*, 445 U.S. 222, 227-30 (1980), first recognized the "traditional" or "classical" theory of

---

[4] "Manipulative," as used in § 10(b), is a narrow "'term of art.'" *Regents of the Univ. of Ca. v. Credit Suisse First Boston (USA), Inc.*, 482 F.3d 372, 390 (5th Cir. 2007) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 199 (1976)). It "refers generally to practices, such as wash sales, matched orders, or rigged prices, that are intended to mislead investors by artificially affecting market activity." *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 476 (1977).

- 8 -

insider trading liability. Under this theory, "§ 10(b) and Rule 10b-5 are violated when a corporate insider trades in the securities of his corporation on the basis of material, nonpublic information." *United States v. O'Hagan*, 521 U.S. 642, 651-52 (1997) (citing *Chiarella*, 445 U.S. at 228). Liability is premised on the "relationship of trust and confidence between the shareholders of a corporation and those insiders who have obtained confidential information by reason of their position with that corporation." *Chiarella*, 445 U.S. at 228. This relationship gives rise to a "duty to disclose" confidential information prior to trading. *Id.*

In *O'Hagan* the Supreme Court expanded the scope of insider trading liability by recognizing the "misappropriation theory," which had been the subject of disagreement among lower courts. "The 'misappropriation theory' holds that a person commits fraud 'in connection with' a securities transaction, and thereby violates § 10(b) and Rule 10b-5, when he misappropriates confidential information for securities trading purposes, in breach of a duty owed to the source of the information." *O'Hagan*, 521 U.S. at 652. The "undisclosed, self-serving use of a principal's information to purchase or sell securities, in breach of a duty of loyalty and confidentiality, defrauds the principal of the exclusive use of that information." *Id.* "In lieu of premising liability on a fiduciary relationship between company insider and purchaser or

- 9 -

seller of the company's stock, the misappropriation theory premises liability on a fiduciary-turned-trader's deception of those who entrusted him with access to confidential information." *Id.*

> The two theories are complementary, each addressing efforts to capitalize on nonpublic information through the purchase or sale of securities. The classical theory targets a corporate insider's breach of duty to shareholders with whom the insider transacts; the misappropriation theory outlaws trading on the basis of nonpublic information by a corporate "outsider" in breach of a duty owed not to a trading party, but to the source of the information.

*Id.* at 652-53.

The nature of the duty required to support misappropriation theory liability is at the heart of the present case and Cuban's motion to dismiss. In 2000 the SEC adopted Rule 10b5-2, which delineates certain circumstances that will give rise to a "duty of trust or confidence" for purposes of the misappropriation theory. Rule 10b5-2(b)(1) provides that "a 'duty of trust or confidence' exists . . . [w]henever a person agrees to maintain information in confidence[.]"

B

The SEC argues that, under Rule 10b5-2(b)(1) and the facts pleaded in the complaint, it has stated a claim on which relief can be granted. According to the SEC, Cuban is liable under the misappropriation theory based on a duty created by his agreement to keep confidential the information that Mamma.com's CEO provided him

about the impending PIPE offering. It posits that Cuban breached this duty when, without disclosing to Mamma.com his intent to trade in its stock based on the information, he sold his shares in the company.

Cuban maintains that he is entitled to dismissal of this suit because, to establish liability for insider trading, the SEC must demonstrate that his conduct was deceptive under § 10(b), as construed by the Supreme Court in *Chiarella* and *O'Hagan*, which Cuban maintains the SEC has not done under the facts pleaded. Cuban argues that the SEC has alleged merely that he entered into a confidentiality agreement, and he posits that such an agreement is of itself inadequate to establish misappropriation theory liability. To be sufficient, he contends, the agreement must arise in the context of a preexisting fiduciary or fiduciary-like relationship, or create a relationship that bears all the hallmarks of a traditional fiduciary relationship. He further maintains that the existence of a fiduciary or fiduciary-like relationship is governed exclusively by state law; that, under applicable Texas law, the facts pleaded do not demonstrate that he had such a relationship with Mamma.com; and that even if the court applies federal common law, the facts pleaded still fail to show such a relationship. Finally, Cuban argues that the SEC cannot rely on Rule 10b5-2(b)(1) to supply the requisite duty because, first, the Rule applies only in the context of family or personal

- 11 -

relationships, and, second, if the Rule does create liability based on a mere confidentiality agreement in the absence of a preexisting fiduciary or fiduciary-like relationship, it exceeds the SEC's § 10(b) rulemaking authority and cannot be applied against him.

IV

Because it affects the resolution of Cuban's other arguments, the court turns first to his contention that his liability under the misappropriation theory depends on the existence of a preexisting fiduciary or fiduciary-like relationship, as determined exclusively under applicable state law.

A

Cuban relies on this court's opinion in *Southwest Realty, Ltd. v. Daseke*, 1992 WL 373166, at *9-*10 (N.D. Tex. May 21, 1992) (Fitzwater, J.), to support his contention that state law regarding fiduciary and fiduciary-like relationships is the exclusive source of the predicate duty for misappropriation theory liability.  He also posits that, unless the court derives the duty from state law alone, its decision will violate the general rule—applied in cases like *Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 478-80 (1977)—against the creation of federal common law.

The SEC counters that no federal court has relied exclusively on state law to determine whether a duty sufficient to support misappropriation theory liability exists.  It contends that were the court to adopt a state-specific standard for deriving the duty,

the decision would balkanize the misappropriation theory and lead to divergent outcomes under the federal securities laws depending on the state of jurisdiction in a particular insider trading case.

B

The court rejects Cuban's contention that *Southwest Realty* compels the conclusion that the existence of a duty sufficient to support misappropriation theory liability is determined exclusively under state law. In *Southwest Realty* the court followed the conclusions of several appellate courts that "the federal securities laws themselves are not the source of a duty of disclosure. 'Rather the duty to disclose material facts arises only where there is some basis outside the securities laws, such as state law, for finding a fiduciary or other confidential relationship.'" *Sw. Realty*, 1992 WL 373166, at *10 (quoting *Fortson v. Winstead, McGuire, Sechrest & Minick*, 961 F.2d 469 (4th Cir. 1992). *Southwest Realty* did not address insider trading or the misappropriation theory, which the Supreme Court did not adopt until several years later. Thus the court had no occasion to hold that state law regarding fiduciary or similar relationships was the only source of a duty to support liability under this theory. Rather, in the factual and legal context presented, the court simply followed settled precedent that provided that the federal securities laws are not the source of a duty of disclosure, and that such a duty must be found elsewhere, such as in state law.

- 13 -

Moreover, although the source of a duty adequate to support insider trading liability *can* be found in state law—this certainly appears to be the case, for example, in *O'Hagan*, 521 U.S. at 652-53 (relying on attorney's fiduciary duty to client)—it may be located elsewhere without violating the general rule against creating federal common law.  The SEC can promulgate a rule that imposes such a duty, provided the rule conforms with the SEC's rulemaking powers, such as those found in § 10(b) of the Exchange Act.  In doing so, the SEC does not create federal general common law. "Common law," when discussed in cases that hold there is no federal general common law, *see, e.g., O'Melveny & Myers v. FDIC*, 512 U.S. 79, 83 (1994) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938)), means judge-made law. *See* Black's Law Dictionary 293 (8th ed.) ("The body of law derived from judicial decisions, rather than from statutes or constitutions[.]").  An agency regulation promulgated under authority conferred by Congress is not judge-made law.  And in concluding below that an agreement with the proper components can establish the duty necessary to support liability under the misappropriation theory, the court is not creating federal general common law.  Because all states recognize and enforce duties created by agreement, the court is essentially relying on the state law of contracts to supply the requisite duty.

Finally, for reasons the court will explain in the next section, it rejects Cuban's contention that liability under the

misappropriation theory depends on the existence of a preexisting fiduciary or fiduciary-like relationship.

V

The court now considers whether, under the Supreme Court's precedents, breach of a legal duty arising by agreement can be the basis for misappropriation theory liability, and, if so, what are the essential components of the agreement.

A

In *Chiarella* the Court recognized the classical theory of insider trading and explained that because insider trading essentially involves the nondisclosure of information, it falls within § 10(b)'s requirement of deception only if there is a duty to disclose. *See Chiarella*, 445 U.S. at 231 (reasoning that trading on material, nonpublic information is "not a fraud under § 10(b)" unless the trader is under a duty to disclose); *id.* at 228 ("But one who fails to disclose material information prior to the consummation of a transaction commits fraud only when he is under a duty to do so."); *id.* at 235 ("When an allegation of fraud is based upon nondisclosure, there can be no fraud absent a duty to speak."). Further, the duty is not a general one but must arise from "a specific relationship between two parties." *Id.* at 233. *Chiarella* unequivocally rejects a "parity-of-information" principle, under which a disclosure duty would arise based on the mere possession of material, nonpublic information. *Id.*

- 15 -

Building on *Chiarella*, the Supreme Court concluded in *O'Hagan* that, like the classical theory, the misappropriation theory also involves deception within the meaning of § 10(b). *O'Hagan* teaches that the essence of the misappropriation theory is the trader's undisclosed use of material, nonpublic information that is the property of the source, in breach of a duty owed to the source to keep the information confidential and not to use it for personal benefit. *See O'Hagan*, 521 U.S. at 652 ("Under this theory, a fiduciary's undisclosed, self-serving use of a principal's information to purchase or sell securities, in breach of a duty of loyalty and confidentiality, defrauds the principal of the exclusive use of that information."); *id.* at 656 ("[T]he fiduciary's fraud is consummated, not when the fiduciary gains the confidential information, but when, without disclosure to his principal, he uses the information to purchase or sell securities."); *see also id.* at 655 (contrasting government's allegations in *O'Hagan* with *Santa Fe* because, in *Santa Fe*, "all pertinent facts were disclosed by the persons charged with violating § 10(b) and Rule 10b-5; therefore, there was no deception through nondisclosure to which liability under those provisions could attach" (citation omitted)). Under the misappropriation theory of insider trading, the deception flows from the undisclosed, duplicitous nature of the breach. *See id.* at 653-54 ("A fiduciary who '[pretends] loyalty to the principal while

secretly converting the principal's information for personal gain'
'dupes' or defrauds the principal." (quoting Brief for United
States 17)); *id.* at 655 ("[T]he deception essential to the
misappropriation theory involves feigning fidelity to the source of
information[.]").

   *O'Hagan* states unmistakably that "[d]eception through
nondisclosure is central to [this] theory[.]" *Id.* at 654. And by
providing that a person can avoid misappropriation theory liability
by disclosing his intention to use confidential information, it
confirms that the deception inheres in the undisclosed use of
information, in breach of a duty not to do so.

> [F]ull disclosure forecloses liability under
> the misappropriation theory . . . . [I]f the
> fiduciary discloses to the source that he
> plans to trade on the nonpublic information,
> there is no "deceptive device" and thus no
> § 10(b) violation––although the
> fiduciary-turned-trader may remain liable
> under state law for breach of a duty of
> loyalty.

*Id.* at 655; *see also id.* at 659 n.9 ("[T]he textual requirement of
deception precludes § 10(b) liability when a person trading on the
basis of nonpublic information has disclosed his trading plans to,
or obtained authorization from, the principal––even though such
conduct may affect the securities markets in the same manner as the
conduct reached by the misappropriation theory."). In simple
terms, the misappropriator acts deceptively, not merely because he
uses the source's material, nonpublic information for personal

- 17 -

benefit, in breach of a duty not to do so, but because he does not disclose to the source that he intends to trade on or otherwise use the information.

B

In the context of the misappropriation theory, therefore, trading on the basis of material, nonpublic information cannot be deceptive unless the trader is under a legal duty to refrain from trading on or otherwise using it for personal benefit. Where the trader and the information source are in a fiduciary relationship, this obligation arises by operation of law upon the creation of the relationship. As *O'Hagan* makes clear, a fiduciary is bound to act loyally toward the principal, and as a part of the duty of loyalty, to use property that has been entrusted to him—including confidential information—to benefit only the principal and not himself. *See O'Hagan*, 521 U.S. at 652 ("[A] fiduciary's undisclosed, self-serving use of a principal's information to purchase or sell securities, in breach of a duty of loyalty and confidentiality, defrauds the principal of the exclusive use of that information."). The deception inheres in the fiduciary's undisclosed breach of this duty. Specifically, the fiduciary deceives the principal by acting the part of a faithful agent in other respects while secretly appropriating the principal's confidential information for his own use. Because of the fiduciary's duty of loyalty, the principal has a right to expect

- 18 -

that the fiduciary is not trading on or otherwise using the principal's confidential information. The fiduciary's duplicitous conduct confirms that expectation while the fiduciary is contemporaneously and secretly violating his duty. Thus the fiduciary's trading violates the principal's legitimate and justifiable expectation that the fiduciary is using the information only for the principal's benefit.

Because under *O'Hagan* the deception that animates the misappropriation theory involves at its core the undisclosed breach of a duty not to use another's information for personal benefit, there is no apparent reason why that duty cannot arise by agreement.[5] Further, recognizing that a duty analogous to the

---

[5]The court disagrees with Cuban's assertion that, in *O'Hagan*, "[t]he Court [drew] a clear distinction between fiduciaries and non-fiduciaries because *only* a fiduciary would have a duty to make this disclosure and therefore can be said to have engaged in a 'deception' if he does not disclose or abstain from trading." D. Reply Br. 2-3 (citing *O'Hagan*, 521 U.S. at 655). Although *O'Hagan* is written in terms of fiduciaries and fiduciary relationships, duties, and obligations, it is reasonable to infer that this is because *O'Hagan* was a criminal case that involved the conduct of a fiduciary. "In this case, the indictment alleged that O'Hagan, in breach of a duty of trust and confidence he owed to his law firm, Dorsey & Whitney, and to its client, Grand Met, traded on the basis of nonpublic information regarding Grand Met's planned tender offer for Pillsbury common stock. This conduct, the Government charged, constituted a fraudulent device in connection with the purchase and sale of securities." *O'Hagan*, 521 U.S. at 653 (citation omitted). The Court may simply have intended that its opinion decide the case without injecting *dicta* to cover other circumstances in which the misappropriation theory could apply. But regardless of the reason, there is no indication in *O'Hagan* that such a fiduciary or fiduciary-like relationship is necessary—as opposed to merely sufficient—to impose the requisite duty, or is otherwise an essential element of the misappropriation theory.

- 19 -

fiduciary's duty of "loyalty and confidentiality" can be created by agreement fully comports with *Chiarella*'s teaching that the duty must arise out of a relationship between specific parties and not the mere possession of confidential information.  The court therefore concludes that a duty sufficient to support liability under the misappropriation theory can arise by agreement absent a preexisting fiduciary or fiduciary-like relationship.

Indeed, the duty that arises by agreement can be seen as conferring a stronger footing for imposing liability for deceptive conduct than does the existence, without more, of a fiduciary or similar relationship of trust and confidence.  In the context of an agreement, the misappropriator has committed to refrain from trading on material, nonpublic information.  The duty is thus created by conduct that captures the person's obligation with greater acuity than does a duty that flows more generally from the nature of the parties' relationship.  The misappropriator is held to terms created by his own agreement rather than to a duty triggered merely by operation of law due to his relationship with the information source.

The agreement, however, must consist of more than an express or implied promise merely to keep information confidential.  It must also impose on the party who receives the information the legal duty to refrain from trading on or otherwise using the information for personal gain.  With respect to confidential

information, nondisclosure[6] and non-use are logically distinct. A person who receives material, nonpublic information may in fact preserve the confidentiality of that information while simultaneously using it for his own gain. Indeed, the nature of insider trading is such that one who trades on material, nonpublic information refrains from disclosing that information to the other party to the securities transaction. To do so would compromise his advantageous position. See O'Hagan, 521 U.S. at 656 ("The misappropriation theory targets information of a sort that misappropriators ordinarily capitalize upon to gain no-risk profits through the purchase or sale of securities."). But although conceptually separate, both nondisclosure and non-use comprise part of the duty that arises by operation of law when a fiduciary relationship is created. Where misappropriation theory liability is predicated on an agreement, however, a person must undertake, either expressly or implicitly, both obligations. He must agree to maintain the confidentiality of the information and not to trade on or otherwise use it. Absent a duty not to use the information for personal benefit, there is no deception in doing so. As in the fiduciary context, the deception occurs when a person secretly trades on confidential information in violation of the source's

---

[6]In this respect, by "nondisclosure" the court means maintaining the confidentiality of information, not the nondisclosure of one's intention to trade on or otherwise use such information.

- 21 -

legitimate and justifiable expectation that the recipient will not do so. *Id.* at 654 ("Deception through nondisclosure is central to [this] theory[.]"). This expectation can be created where the source entrusts a person with confidential information in reliance on the recipient's agreement not to disclose the information and not to use it for personal gain. The expectation is not unilateral, arising merely from the source's subjective belief that the recipient will not trade on the information. It rests on the recipient's undertaking of a duty to refrain from doing so as well. *Cf. United States v. Chestman*, 947 F.2d 551, 567 (2d Cir. 1991) (noting, in context of insider trading suit, that "a fiduciary duty cannot be imposed unilaterally by entrusting a person with confidential information"); *United States v. Reed*, 601 F. Supp. 685, 715 (S.D.N.Y.) (reasoning, in same context, that "[t]he mere unilateral investment of confidence by one party in the other ordinarily will not suffice to saddle the parties with the obligations and duties of a confidential relationship"), *rev'd on other grounds*, 773 F.2d 477 (2d Cir. 1985). For the recipient then to exploit the information's value in the securities markets, without disclosing to the source his intent to do so, violates the source's legitimate and justifiable expectation and deceives him. In short, the recipient's agreement not to use the source's information for personal benefit, combined with his subsequent undisclosed use of the information for securities trading purposes,

- 22 -

makes his conduct deceptive under § 10(b) and Rule 10b-5.[7]

Although the court therefore agrees with Cuban that an agreement must contain more than a promise of confidentiality, the court disagrees with his contention that, for a person to be held liable under the misappropriation theory, he must enter into an agreement that creates a relationship bearing all the hallmarks of a traditional fiduciary relationship. And the court respectfully

---

[7]Cases decided both before and after *O'Hagan* have recognized that a duty sufficient to support misappropriation theory liability may arise by agreement. *See, e.g., SEC v. Yun*, 327 F.3d 1263, 1273 (11th Cir. 2003) (stating that "[o]f course, a breach of an agreement to maintain business confidences would also suffice" to yield insider trading liability); *United States v. Falcone*, 257 F.3d 226, 234 (2d Cir. 2001) (holding that "a fiduciary relationship, or its functional equivalent, exists only where there is explicit acceptance of a duty of confidentiality or where such acceptance may be implied from a similar relationship of trust and confidence between the parties" (citing *Chestman*, 947 F.2d at 567-68)); *Chestman*, 947 F.2d at 571 (reasoning that "fiduciary status" could be established by "a pre-existing fiduciary relation or an express agreement of confidentiality"); *Nothern*, 598 F.Supp.2d at 175 (holding that SEC's allegation that person had "expressly agreed to maintain the confidentiality of . . . information is sufficient to state a claim that he had a 'similar relationship of trust and confidence'"); *SEC v. Lyon*, 529 F.Supp.2d 444, 452-53 (S.D.N.Y. 2008) (holding that SEC had adequately alleged existence of predicate duty for misappropriation theory liability by pleading that purchase agreement and other materials related to PIPE offering contained confidentiality conditions and provisions, including requirements that defendants use information for sole purpose of evaluating possible investment in the offering, and discovery might reveal that defendants had explicitly accepted the conditions or that it was customary practice among participants in private placement market to be bound and abide by such provisions). Because none of these cases analyzes the nature of the agreement that is required for misappropriation theory liability, none is contrary to the court's holding today that an agreement must include both an obligation to maintain the confidentiality of the information *and* not to trade on or otherwise use it.

- 23 -

declines to follow the case Cuban cites in support of this proposition: *United States v. Kim*, 184 F.Supp.2d 1006 (N.D. Cal. 2002). *See id.* at 1011 (holding that "a similar relationship of trust and confidence must be characterized by superiority, dominance, or control"); *id.* at 1015 ("In the Court's opinion . . . an express agreement can provide the basis for misappropriation liability only if the express agreement sets forth a relationship with the hallmarks of a fiduciary relationship detailed above."). Although no court appears to have analyzed the precise question that this court examines above—i.e., the nature of an agreement that can give rise to misappropriation theory liability—some have disagreed with *Kim*'s holding that a relationship marked by factors such as superiority, dominance, or control is required. *See, e.g.*, *SEC v. Nothern*, 598 F.Supp.2d 167, 176 (D. Mass. 2009) ("[A] 'similar relationship of trust and confidence' [may] exist[ ] even in the absence of a scintilla of superiority or dominance[.]"); *SEC v. Kirch*, 263 F.Supp.2d 1144, 1150 (N.D. Ill. 2003) ("[T]he 'duty of loyalty and confidentiality' owed by the outsider . . . to the person . . . who shared confidential information with him or her . . . is *not* limited to fiduciary relationships in the limited sense that requires such factors as control and dominance on the part of the fiduciary.").[8] Moreover, if an agreement has the

---

[8]The court notes that, in an insider trading case decided by this court, Judge Lindsay relied in part on the *Kim* factors to hold that liability existed under the misappropriation theory. *See SEC*

elements necessary to conform to the principles of the misappropriation theory liability recognized in *O'Hagan*, it should not be determinative whether the agreement creates a relationship in which one party is superior to, or exercises control or dominance over, the other.

C

The conclusion that an agreement imposing duties of nondisclosure and non-use can support liability under the misappropriation theory is supported by its consistency with the purpose of the theory. The misappropriation theory "address[es] efforts to capitalize on nonpublic information through the purchase or sale of securities." *O'Hagan*, 521 U.S. at 652. It is "designed to 'protec[t] the integrity of the securities markets against abuses by "outsiders" to a corporation who have access to confidential information that will affect th[e] corporation's security price when revealed, but who owe no fiduciary or other duty to that corporation's shareholders.'" *Id*. at 653 (quoting Brief for United States 14). "The theory is . . . well tuned to an

---

v. *Kornman*, 391 F.Supp.2d 477, 488-89 (N.D. Tex. 2005) (Lindsay, J.). But unlike in *Kim*, Judge Lindsay was not explicitly addressing whether factors such as superiority, dominance, or control were required for liability under the misappropriation theory. Instead, he relied on *Kim* and other cases in "consider[ing] the indicia giving rise to a fiduciary or fiduciary-like relationship in the arena of securities fraud." *Id*. at 486. In other words, he assumed that such a relationship was necessary for misappropriation theory liability, and he relied on *Kim* and similar cases to determine whether such a relationship had been adequately pleaded.

animating purpose of the Exchange Act: to insure honest securities
markets and thereby promote investor confidence."   *Id*. at 658.
"Although informational disparity is inevitable in the securities
markets, investors likely would hesitate to venture their capital
in a market where trading based on misappropriated nonpublic
information is unchecked by law."   *Id*.   The goal of protecting the
integrity of the securities markets and promoting investor
confidence would be achieved just as effectively by enforcing
duties of nondisclosure and non-use that arise by agreement as by
enforcing duties that flow from the nature of the relationship
between the information source and the misappropriator.   In fact,
the converse is also true: investors likely would hesitate to
venture their capital if they knew that while a corporate outsider
in a fiduciary relationship could *not* trade based on
misappropriated nonpublic information, an outsider who had actually
agreed with the source not to trade on such information, but was
not a fiduciary, *could* do so.

VI

The court next addresses whether the SEC has adequately
alleged that Cuban entered into an agreement sufficient to create
the duty necessary to establish misappropriation theory liability.
State common law can impose such a duty, provided Cuban entered
into an express or implied agreement with Mamma.com not to disclose
material, nonpublic information about the PIPE offering *and* not to

- 26 -

trade on or otherwise use the information.  The court concludes that the SEC's complaint is deficient in this critical respect.

Regarding the telephone call during which the alleged agreement was made, the SEC merely alleges that Cuban "agreed that he would keep whatever information the CEO intended to share with him confidential"; that in reliance on that agreement, the CEO informed him of the PIPE offering; and that Cuban expressed displeasure at this news and, at the end of the call, stated "Well, now I'm screwed. I can't sell." Compl. ¶ 14.  Thus while the SEC adequately pleads that Cuban entered into a confidentiality agreement, it does not allege that he agreed, expressly or implicitly, to refrain from trading on or otherwise using for his own benefit the information the CEO was about to share.  Although at one point Cuban allegedly stated that he was "screwed" because he "[could not] sell," this appears to express his belief, at least at that time, that it would be illegal for him to sell his Mamma.com shares based on the information the CEO had provided. This statement, however, cannot reasonably be understood as an agreement not to sell based on the information.  Further, the complaint asserts no facts that reasonably suggest that the CEO intended to obtain from Cuban an agreement to refrain from trading on the information as opposed to an agreement merely to keep it confidential.

Nor is it sufficient that the complaint indicates that the

trade on or otherwise use the information. The court concludes that the SEC's complaint is deficient in this critical respect.

Regarding the telephone call during which the alleged agreement was made, the SEC merely alleges that Cuban "agreed that he would keep whatever information the CEO intended to share with him confidential"; that in reliance on that agreement, the CEO informed him of the PIPE offering; and that Cuban expressed displeasure at this news and, at the end of the call, stated "Well, now I'm screwed. I can't sell." Compl. ¶ 14. Thus while the SEC adequately pleads that Cuban entered into a confidentiality agreement, it does not allege that he agreed, expressly or implicitly, to refrain from trading on or otherwise using for his own benefit the information the CEO was about to share. Although at one point Cuban allegedly stated that he was "screwed" because he "[could not] sell," this appears to express his belief, at least at that time, that it would be illegal for him to sell his Mamma.com shares based on the information the CEO had provided. This statement, however, cannot reasonably be understood as an agreement not to sell based on the information. Further, the complaint asserts no facts that reasonably suggest that the CEO intended to obtain from Cuban an agreement to refrain from trading on the information as opposed to an agreement merely to keep it confidential.

Nor is it sufficient that the complaint indicates that the

executive chairman of Mamma.com may have expected that Cuban would not sell until the PIPE was publicly announced. *See id.* at ¶ 15 ("'[Cuban] said he would sell his shares (recognizing that he was not able to do anything until we announce the equity)[.]'" (quoting email of executive chairman to Mamma.com board)); *id.* at ¶ 20 ("'[Cuban's] answers were: he would not invest, he does not want the company to make acquisitions, he will sell his shares which he can not [sic] do until after we announce.'" (quoting second email of executive chairman to board)). Outside a fiduciary or fiduciary-like relationship, a mere unilateral expectation on the part of the information source—one that is not based on the other party's agreement to refrain from trading on the information—cannot create the predicate duty for misappropriation theory liability.

### VII

Having determined that the SEC's complaint is insufficient to plead a duty arising by agreement, the court turns finally to the parties' arguments regarding whether the SEC can rely on Rule 10b5-2(b)(1) to impose the required duty.[9]

---

[9]In light of the court's conclusion on this issue, it need not address at length Cuban's contention that Rule 10b5-2(b)(1) applies only to family and other personal relationships, i.e., non-business relationships. Were the court to reach this question, however, it would join the other courts that reject such a limitation on Rule 10b5-2(b)(1)'s reach. *See, e.g., Nothern,* 598 F.Supp.2d at 174-75.

- 28 -

A

The SEC's rulemaking authority under § 10(b) is bounded by the statute's proscription of conduct that is manipulative or deceptive. The SEC cannot by rule make unlawful conduct that does not fall into one of these categories. *See O'Hagan*, 521 U.S. at 651 ("Liability under Rule 10b-5, our precedent indicates, does not extend beyond conduct encompassed by § 10(b)'s prohibition.") (citing *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 214 (1976); *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 173 (1994)); *id.* at 655 ("[Section] 10(b) is not an all-purpose breach of fiduciary duty ban; rather, it trains on conduct involving manipulation or deception." (citing *Santa Fe Indus.*, 430 U.S. at 473-76)). In the context of the misappropriation theory, the SEC cannot by rule predicate liability on an agreement that lacks the necessary component of an obligation not to trade on or otherwise use confidential information for personal benefit. As the court has explained, it is the undisclosed use of such information, in breach of a duty not to use it for personal benefit, that makes the conduct deceptive under § 10(b) and Rule 10b-5.

B

In considering whether Rule 10b5-2(b)(1) can serve as the basis for misappropriation theory liability, the court first examines its plain meaning. Courts in the Fifth Circuit "interpret

regulations in the same manner as statutes, looking first to the regulation's plain language.  Where the language is unambiguous, [courts] do not look beyond the plain wording of the regulation to determine meaning."  *Anthony v. United States*, 520 F.3d 374, 380 (5th Cir. 2008).  "The appropriate starting point when interpreting any statute is its plain meaning."  *United States v. Elrawy*, 448 F.3d 309, 315 (5th Cir. 2006) (citing *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 242 (1989)).  "The plain meaning of legislation should be conclusive, except in the 'rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters.'"  *Ron Pair Enters.*, 489 U.S. at 242 (quoting *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 571 (1982)).

To determine "the plain meaning of the statute, the court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole."  *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988) (citing *Bethesda Hosp. Ass'n. v. Bowen*, 485 U.S. 399, 403-05 (1988); *Offshore Logistics, Inc. v. Tallentire*, 477 U.S. 207, 220-21 (1986)).  "It is 'a cardinal principle of statutory construction' that 'a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.'"  *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (quoting *Duncan v. Walker*, 533 U.S. 167, 174 (2001)).  The court

"must, if possible, construe a statute to give every word some operative effect." *Cooper Indus., Inc. v. Aviall Servs., Inc.*, 543 U.S. 157, 167 (2004) (citing *United States v. Nordic Vill., Inc.*, 503 U.S. 30, 35-36 (1992)).

C

Rule 10b5-2 provides:

> Preliminary Note to § 240.10b5-2: This section provides a non-exclusive definition of circumstances in which a person has a duty of trust or confidence for purposes of the "misappropriation" theory of insider trading under Section 10(b) of the Act and Rule 10b-5. The law of insider trading is otherwise defined by judicial opinions construing Rule 10b-5, and Rule 10b5-2 does not modify the scope of insider trading law in any other respect.

> (a) Scope of Rule. This section shall apply to any violation of Section 10(b) of the Act (15 U.S.C. § 78j(b)) and § 240.10b-5 thereunder that is based on the purchase or sale of securities on the basis of, or the communication of, material nonpublic information misappropriated in breach of a duty of trust or confidence.

> (b) Enumerated "duties of trust or confidence." For purposes of this section, a "duty of trust or confidence" exists in the following circumstances, among others:

> (1) Whenever a person agrees to maintain information in confidence;

> (2) Whenever the person communicating the material nonpublic information and the person to whom it is communicated have a history, pattern, or practice of sharing confidences, such that the recipient of the information knows or reasonably should know that the person communicating the material nonpublic

information expects that the recipient will
maintain its confidentiality; or

(3) Whenever a person receives or obtains
material nonpublic information from his or her
spouse, parent, child, or sibling; provided,
however, that the person receiving or
obtaining the information may demonstrate that
no duty of trust or confidence existed with
respect to the information, by establishing
that he or she neither knew nor reasonably
should have known that the person who was the
source of the information expected that the
person would keep the information
confidential, because of the parties' history,
pattern, or practice of sharing and
maintaining confidences, and because there was
no agreement or understanding to maintain the
confidentiality of the information.

17 C.F.R. § 240.10b5-2 (2009).

The court concludes that, by its terms, Rule 10b5-2(b)(1)
attempts to base misappropriation theory liability on an agreement
that lacks an obligation not to trade on or otherwise use
confidential information. The agreement specified in the Rule—"to
maintain information in confidence"—relates merely to preserving
the confidentiality of the information. The word "maintain"
captures the obligation to keep the information in its existing
state, and the modifying phrase "in confidence" indicates that the
state to be preserved is its confidentiality. Nothing in Rule
10b5-2(b)(1) requires that the agreement encompass an obligation
not to trade on or otherwise use the information.

That Rule 10b5-2(b)(1) relates to an agreement to preserve
confidentiality is supported by the language and design of Rule

10b5-2 as a whole.   It accords with the interpretation of Rule 10b5-2(b)(2) and (b)(3), which, like (b)(1), specify circumstances in which a duty of trust or confidence exists.   Rule 10b5-2(b)(2) creates the duty based on a history, pattern, or practice of sharing confidences if "the recipient of the information knows or reasonably should know that the person communicating the material nonpublic information expects that the recipient will maintain its confidentiality."   Rule 10b5-2(b)(3) creates a rebuttable rule that a duty of trust or confidence exists in certain enumerated family relationships, unless the person demonstrates that "he or she neither knew nor reasonably should have known that the person who was the source of the information expected that the person would keep the information confidential, because of the parties' history, pattern, or practice of sharing and maintaining confidences, and because there was no agreement or understanding to maintain the confidentiality of the information."   Thus Rule 10b5-2(b)(2) and (b)(3) also base misappropriation theory liability on an undertaking, express or implied, to maintain confidentiality of information, but they do not require an undertaking not to trade on or otherwise use the information for personal benefit.

Because Rule 10b5-2(b)(1) attempts to predicate misappropriation theory liability on a mere confidentiality agreement lacking a non-use component, the SEC cannot rely on it to establish Cuban's liability under the misappropriation theory.   To

permit liability based on Rule 10b5-2(b)(1) would exceed the SEC's § 10(b) authority to proscribe conduct that is deceptive. *See* *O'Hagan*, 521 U.S. at 651 ("Liability under Rule 10b-5, our precedent indicates, does not extend beyond conduct encompassed by § 10(b)'s prohibition."). This is because, as the court has explained, under the misappropriation theory of liability, it is the undisclosed use of confidential information for personal benefit, in breach of a duty not to do so, that constitutes the deception.

VIII

Because the SEC has failed to allege that Cuban undertook a duty to refrain from trading on information about the impending PIPE offering, and because the SEC cannot rely on the duty imposed by Rule 10b5-2(b)(1) alone, Cuban cannot be held liable under the misappropriation theory of insider trading liability, even accepting all well-pleaded facts as true and viewing them in the light most favorable to the SEC. The court therefore grants Cuban's motion to dismiss the complaint under Rule 12(b)(6).

The court will allow the SEC 30 days from the date of this memorandum opinion and order to file an amended complaint, if the SEC can allege that Cuban undertook a duty, expressly or implicitly, not to trade on or otherwise use material, nonpublic information about the PIPE offering.

> [I]n view of the consequences of dismissal on
> the complaint alone, and the pull to decide
> cases on the merits rather than on the
> sufficiency of pleadings, district courts
> often afford plaintiffs at least one
> opportunity to cure pleading deficiencies
> before dismissing a case, unless it is clear
> that the defects are incurable or the
> plaintiffs advise the court that they are
> unwilling or unable to amend in a manner that
> will avoid dismissal.

*In re Am. Airlines, Inc., Privacy Litig.*, 370 F.Supp.2d 552, 567-68

(N.D. Tex. 2005) (Fitzwater, J.) (quoting *Great Plains Trust Co. v.*

*Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 329 (5th Cir.

2002)). If the SEC cannot replead as required by today's decision,

it may so inform the court, and this case will be dismissed with

prejudice.

\*     \*     \*

Cuban's January 14, 2009 motion to dismiss is granted.  The

SEC is granted 30 days from the date of this memorandum opinion and

order to file an amended complaint.

**SO ORDERED.**

July 17, 2009.


SIDNEY A. FITZWATER
CHIEF JUDGE


- 35 -