UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 09-21977-CIV-JORDAN/MCALILEY

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) ) ) |
| KEVAN D. ACORD, PHILIP C. GROWNEY, ALBERTO J. PEREZ, JOSE G. PEREZ, SEBASTIAN DE LA MAZA, AND THOMAS L. BORELL | ) ) ) ) ) ) ) |
| Defendants. | ) ) |

**PLAINTIFF RESPONSE TO DEFENDANT THOMAS L. BORELL'S MOTION FOR SUMMARY JUDGMENT**

**I. INTRODUCTION**

Thomas Borell's summary judgment motion incorrectly relies almost entirely on the subjective belief of Jose Mas regarding the nature of Mas' relationship with Borell, and whether Mas intentionally disclosed material non-public information about Neff Corp. to Borell. However Mas' subjective beliefs, or those of Borell and their respective wives, are not what the Court should focus on in determining whether Borell has met the high burden for obtaining summary judgment. This is an insider trading case, in which the commission may establish liability through circumstantial evidence. Borell's motion ignores the mountain of objective evidence showing: (1) Borell and Mas frequently socialized together; (2) traveled together, twice during March 2005 when Neff was engaged in acquisition discussions with Odyssey

Investment Partners; (3) that Mas acknowledged likely discussing the potential deal with his brother on one of the trips; and (4) during those trips, Borell began an unprecedented buying spree in Neff stock. These facts more than give rise to a reasonable inference that Borell misappropriated material non-public information from Mas to buy Neff stock. The Court should therefore deny summary judgment and allow the trier fact to resolve factual questions and inferences at trial.

## II. THE STANDARD FOR SUMMARY JUDGMENT AND ASSESSING EVIDENCE

Borell has the burden of showing the absence of a genuine issue of any material fact to prevail on his motion.[1] In deciding whether he has met this heavy burden, the Court must view the evidence and all factual inferences arising from it in the light most favorable to the Commission, and must draw all justifiable inferences from the evidence against Borell and in the Commission's favor.[2] Borell's evidence must be so great that he has to prevail as a matter of law.[3] If reasonable minds can differ on the inferences arising from the facts, a court should deny summary judgment.[4]

To prove a claim for securities fraud under §10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, on a "misappropriation" theory, the Commission must establish that an individual obtained confidential information "by reason of their relationship with the person possessing such information," and willfully "breached a duty of

---

[1] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[2] *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993); *Anderson*, 477 U.S. at 255; *SEC v. Roszak*, 495 F. Supp. 2d 875, 887-88 (N.D. Ill. 2007). *See also King v. Preferred Technical Group*, 166 F.3d 887, 890 (7th cir. 1998); SEC *v. Van Wagner*, 1999 WL 691836 at *3-*4 (N.D. Ill. Aug. 25, 1999) ("[t]he innocent explanations offered by the defendants are limited by the inferences that must be drawn against them on their motions for summary judgment").

[3] *Id.*

[4] *Miranda v. B&B Cash Grocery Store,* 975 F.2d 1518, 1534 (11th Cir. 1992).

loyalty and confidentiality" by trading securities with that information.[5]

The Commission may prove its case through circumstantial evidence.[6] In opposing a defendant's summary judgment motion, the Commission does not have to prove the violation as if at trial.[7] Rather, all the Commission must do is put in evidence that reasonably permits that inference.[8] The Commission does not need to present direct testimonial confession.[9] Circumstantial evidence carries no less weight than direct evidence as long as it reasonably establishes the fact sought to be proved, and evidence is sufficient as long as it permits a reasonable inference of an element of insider trading.[10] Because such decisions often rest on witness credibility, it is for the trier of fact at trial to decide which of two competing explanations for trading to accept.[11]

The Commission may present evidence on a variety of factors to support the inference of insider trading, including: (1) access to information; (2) relationship between the information source and the trader; (3) timing of contact between the source and the trader; (4) timing of the

---

[5] *SEC v. Yun*, 327 F.3d 1263, 1269 (11th Cir. 2003), citing *US v. O'Hagan,* 521 U.S. 642, 652, 655 (1997).

[6] *SEC v. Ginsburg*, 362 F.3d 1292, 1298 (11th Cir. 2004); *Roszak*, 495 F. Supp. 2d at 886-87; *SEC v. Singer*, 786 F. Supp. 1158, 1164-65 (SDNY 1992).

[7] *See SEC v. Evans*, Case No. CV-05-1162, 2006 WL 3311872 at *4 (D. Or. Nov. 13, 2006) (at this stage, the Commission "does not have the burden of putting in evidence that *compel[s]* an inference that the tipper conveyed nonpublic information to the tippee")*,* citing *Ginsburg*, 362 F.3d at 1301 (emphasis added); *SEC v. Saul*, No. 90 C 2633, 1991 WL 133738 at *2 (N.D. Ill. July 12, 1991) ("giving the SEC the favorable inferences to which it is entitled at this stage, the circumstantial evidence of insider trading is so strong that no more persuasive evidence is required in order for the case to proceed to trial").

[8] *Id.*; *Ginsburg*, 362 F.3d at 1301 ("[t]he SEC did not have the burden of putting in evidence that compelled the inference Ginsburg conveyed nonpublic information . . . . All it was required to do was put in evidence that reasonably permitted that inference. It did that.").

[9] *SEC v. Bluestone, et al.*, 1991 U.S. Dist. LEXIS 2793 *3, (citing *Herman & MacLean v. Huddleston*, 459 U.S. 375, 390 n. 30 (1983); *SEC v. Burns*, 816 F.2d 471, 474 (9th Cir. 1987); *SEC v. Musella*, 678 F. Supp. 1060, 1062-63 (S.D.N.Y. 1988).

[10] *Ginsburg*, 362 F.3d at 1298.

[11] *Id.*, 362 F.3d at 1301 (jury must decide between competing "plausible" theories of the Commission and defendants); *Adler*, 137 F.3d at 1342 (issue of whether to believe Commission's allegations or defendants' explanations was for trier of fact); *Roszak*, 495 F. Supp. 2d at 888 (in insider trading case, trier of facts would decide whether to believe Commission's or defendant's version of events); *Saul*, 1991 WL 133738, at *2 (in insider trading case, "the task of resolving the dispute between the parties as to what actually occurred is one which must be assigned to the jury").

trades; (5) unusually large trades; (6) pattern of the trades; (7) attempts to conceal either the trades or the relationship between the source and the trader; (8) the offering of implausible reasons for the trades; and (9) the temporal proximity of the trading to the receipt of information.[12] There is abundant evidence covering many of these factors and preventing summary judgment for Borell.

### III. THE EVIDENCE DOES NOT SUPPORT GRANTING SUMMARY JUDGMENT

The evidence calls for the trier of fact to determine this case at trial and resolve the various credibility and factual issues. Borell, his wife, and Jose and Patricia Mas describe Borell and Jose Mas as mere acquaintances, with no more expectations of each other than they would have for strangers. But the Court should not consider this testimony in a vacuum. These same witnesses surround their statements with a significant amount of evidence raising questions about their credibility, the relationship between Borell and Mas, and Borell's reasons for his massive and concentrated trading in Neff from February 28 through April 4, 2005.

**A. The Borell-Mas relationship**

The Court should note the extreme contrast between how Jose Mas and Borell describe their interaction, and the close and active relationship they and their families actually enjoyed. The Borell and Mas families got to know each other several years before Borell's Neff trades, when their sons started preschool as classmates and began doing school and extracurricular

---

[12] *S.E.C. v. Adler*, 137 F.3d 1325, 1340-42 (11th Cir. 1998) citing *Freeman v. Decio*, 584 F.2d 186, 197 n. 44 (7th Cir.1978) and quoting In *re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1117 (9th Cir.1989); *Ginsburg*, 362 F.3d at 1299 ("[t]he larger and more profitable the trades, and the closer in time to the trader's exposure to the insider, the stronger the inference that the trader was acting on the basis of inside information"); *U.S. v. Larrabee*, 240 F.3d 18, 21-24 (1st Cir. 2001) (defendant made trades twice as large as previous ones; his family had relationship with that of one source of inside information; another information source could not rule out inadvertently passing information); *SEC v. Sargent*, 229 F.3d 68, 75 (1st Cir. 2000) (facts that defendant took out a loan to finance his stock purchase and provided less-than-credible explanation for why he traded outweighed defendant's assertion he acted on a hunch); *SEC v. Michel*, 521 F. Supp. 2d 795, 822-830 (N.D. Ill. 2007); *Roszak*, 495 F.Supp.2d at 891 (unusually successful trading).

4

activities.[13] They were part of a "very close tight group of parents" with children in the same grade, who for years socialized and vacationed together.[14] Their activities included children's and adults' birthday parties, dinners, movies, holiday events, First Communion, and annual ski and Disney trips.[15] Jose Mas' family was one of the families with whom the Borells socialized the most, and the Borells' defined their circle of friends by whom they joined in children's activities.[16] This group of friends had dinner just with the adults, and was comfortable enough with each other for Jose Mas and others to joke that Borell, a lawyer, was an "ambulance chaser."[17]

The Borell and Mas families attended annual Disney and ski trips with others from the close group of families with children in the same school on the same vacation schedules.[18] On these trips, they would eat and do other activities together.[19] During the March 2005 ski trip the Borells' and Mas' sons were in ski school together, and their fathers spoke multiple times by mobile telephone.[20]

Contrary to the relationship Borell portrays between Jose Mas and himself – strangely disconnected from and unaffected by years of activities with their families and tight-knit group of friends – a reasonable trier of fact could properly infer there actually was a duty of loyalty and confidence expected of members of the Borell and Mas' circle of friends. One would expect this relationship of people who had been friends for years and engaged in so many family activities and life ceremonies with children. It is a reasonable inference that people whose lives were so

---

[13] Commission Statement of Disputed Facts (hereinafter "Disp. Facts") at ¶ 1, 1.a.
[14] Disp. Facts at ¶ 1, 1.a.
[15] *Id.*
[16] *Id.* at ¶ 1.
[17] *Id.* at ¶ 1, 1.b.
[18] Disp. Facts at ¶ 1.c
[19] *Id.*
[20] *Id.*

intertwined would expect more of each other in keeping confidences than they would from someone they barely knew. The trier of fact could also reasonably find that, for obvious reasons, the Borells minimized the relationship between Jose Mas and Borell, while Jose Mas and his wife played down the relationship in hopes of avoiding problems for their family friend. However strong Borell believes his evidence, he has not established as a matter of law and to the exclusion of other reasonable inferences that there was no relationship and duty between himself and Jose Mas to support the Commission's insider trading claim against him.[21]

**B.  Borell's Misappropriation of Material Non-Public Information for Trading**

Borell's sudden and massive purchases of Neff stock starting just after the Neff-Odyssey letter of intent and the beginning of due diligence are suspicious to say the least, giving a trier of fact ample basis to conclude he obtained and traded upon inside information from Jose Mas.[22] Even with strong evidence from a defendant showing he did not receive or trade using inside information, in light of a suspicious sequence of events, a reasonable jury may reject the defendant's explanation.[23]

The suspicious timing, method, and profitability of Borell's sudden passion for Neff stock supports the reasonable inference that he misappropriated material non-public information from Jose Mas and traded with it.[24] Jose Mas, a Neff director, had learned of Odyssey's interest

---

[21] *Adler*, 137 F.3d at 1341-42; *Larrabee*, 240 F.3d at 22 (one factor establishing relationship supporting insider trading liability was relationship between source and defendant, whose families had "spent various weekends, holidays and vacations together . . . [and] celebrated New Year's Eve together"); *SEC v. Rorech*, 673 F.Supp.2d 217, 226-27 (SDNY 2009) (source's procedures for sharing information and failure to handle as confidential "somewhat probative" but did not control whether the defendant breached a duty or the information was confidential).

[22] *Adler*, 137 F.3d at 1340 (11th Cir. 1998)

[23] *Id*. at 1342 ("Although [Defendant's] evidence is strong, we cannot conclude that a reasonable jury was required as a matter of law to believe every detail of the plan as asserted . . . nor was the jury required to believe the allegedly innocent explanations for the telephone calls") ("these fact-intensive issues should be decided by a jury . . . ."); *Larrabee*, 240 F.3d at 22 (explaining that one of the inferences supporting an insider trading conviction arose from one source's testimony "that he did not recall telling [the defendant] about the bank merger, but could not 'say with absolute certainty that [he] didn't say something inadvertently'" to the defendant).

[24] *Adler*, 137 F.3d at 1341-42; *Ginsburg*, 362 F.3d at 1299; *Larrabee*, 240 F.3d 18, 21-24.

in acquiring Neff early in the process, and acknowledged the Neff-Odyssey merger was an important deal,[25] meaning information about the transaction would have been particularly sensitive. Jose Mas thought he might have asked his brother (Neff's CEO) how things were going with the deal, and could not rule out the possibility that Borell might have overhead a discussion of the transaction.[26]

Borell's unusual stock purchases also support an inference he misappropriated material non-public information to trade.[27] Borell had not bought Neff stock in almost six years (and then for a loss), and began acquiring shares in 2005 when the Neff-Odyssey negotiations had been ongoing for more than two months, the companies had signed a letter of intent, and the due diligence process had just begun.[28] He liquidated two large positions in other stocks to make accelerated purchases of Neff, which he began selling for a profit a week after his finished buying the stock.[29] His $1.3 million in Neff purchases, condensed into approximately five weeks, made possible by liquidating two other large positions he had just acquired, and done while he at times carried debt or low cash reserves in his account and still owed his mother money, was an unusual set of stock transactions for him.[30]

Borell's explanation of how and why he decided to purchase so much Neff stock in such a short time is filled with inconsistencies. He maintains he spent the majority of his day trading or watching stocks, but his wife does not recall seeing him do any research on stocks, have any

---

[25] Disp. Facts at ¶ 3.b.
[26] *Id.* at ¶ 3.d, e.
[27] *Adler*, 137 F.3d at 1341-42, *Singer*, 786 F. Supp. at 1165 n.1 (among factors for denying insider trading defendant's summary judgment motion were "realization by the defendant of a substantial gain shortly after making the suspicious purchase(s) . . . the investment of a substantial dollar amount in a suspicious purchase, giving rise to the inference that the buyer had an undisclosed, unlawful source of confidence . . . [and] a reasonable argument by the plaintiff that defendant's explanation for his trades is not credible . . . .")
[28] *Id.* at ¶ 3.a, f, g.
[29] *Id.* at ¶ 3.g, h.
[30] *Id.* at ¶¶ g, h, m.

discussions about stocks, or make any trades.[31] His professed concentration on trading for ninety percent of each work day, focus on local stocks, and frequent contacts with his broker regarding what stocks to buy are distinctly less credible in light of the evidence. His broker testified he did not provide analysis to Borell, and Borell did not focus on any particular market segment, while Borell undercuts his declared attention to local stocks by claiming he did not realize Neff stock was publicly traded until his broker mentioned the company.[32] Although Borell testified he focused on local stocks, in the almost one year before he bought Neff and liquidated his other holdings to do so, his largest one-month accumulation of a single common stock before then was in Akamai Technologies, a Massachusetts company.[33] For someone who claimed to spend so much time trading or researching trades, and who had not bought Neff stock for almost six years, Borell's ostensible reasons for craving Neff shares during that five-week period in 2005 were unconvincing. Borell committed almost his entire account based on unverified rumors regarding potential Mas family purchases of a yacht, a jet, and a condominium, the amount of skiing Juan Carlos Mas did on the March 2005 trip Borell attended, as well as price increases, which did not deter him from buying more, even as the price more than doubled.[34]

The more exposure Borell had to Jose Mas and his brothers, the more Neff stock he apparently wanted. To buy the amount of Neff stock he wanted, Borell quickly sold his entire position in MasTec and most of his position in Terremark for losses, enabling him ultimately to purchase $1.34 million of Neff stock.[35] He bought more than half of his total Neff purchases during an intense period of trading coinciding with the ski trip his family attended with Jose

---

[31] *Id.* at ¶¶ 3.k, l.
[32] *Id.* at ¶¶ 3.i.
[33] *Id.* at ¶¶ i, j, m, n.
[34] *Id.* at ¶¶ 3.j, k.
[35] *Id.* at ¶¶ 3.g.

Mas' family and those of Jose Mas' two brothers, Neff's CEO and another Neff director.[36]  His Neff buys were a stunning 20%-30% of *all* of Neff's trading volume during that period, ranging from 9.5% to 54.2% of the stock's volume on a daily basis.[37]  He sank his funds into Neff stock with abandon, even though he still owed his mother money and either had a negative balance in the account or a relatively small amount of cash otherwise.[38]

A very reasonable inference from these facts is that Borell was obtaining inside information about the Neff-Odyssey deal, leading him quickly to commit huge resources to buy Neff stock, even though it was costing him more each day.  With such inside information, Borell would not have worried about risking too much on one stock or paying too much for the stock as its price peaked, because he already knew there was a transaction guaranteed to boost the price even more upon the deal's announcement.

## IV. CONCLUSION

Borell's summary judgment motion takes a narrow view of the evidence the jury would face at trial.  It ignores the circumstantial evidence of Borell's trading using material non-public information he misappropriated from Jose Mas, as well as the multiple reasonable inferences a jury could draw from this evidence.  At this stage Borell must show that even with all inferences drawn in favor of the Commission, the trier of fact would have to find for him as a matter of law.  Because he cannot do this in the face of the many reasonable inferences a jury could draw regarding his and the Mas' credibility, Jose Mas' actual expectations of him as a member of a close-knit group of families linked by their children, and his reasons for his striking Neff trades, the Court should deny his Motion for Summary Judgment.

---

[36] *Id.* at ¶¶ 3.h.
[37] *Id.*
[38] *Id.* at ¶¶ 3.g.

WHEREFORE, the Commission requests the Court deny Thomas Borell's Motion for Summary Judgment.

September 13, 2010                    Respectfully submitted,

                                By:  s/ Scott A. Masel
                                    Scott A. Masel
                                    Senior Trial Counsel
                                    Florida Bar No. 0007110
                                    Direct Dial:  (305) 982-6398
                                    E-mail: masels@sec.gov

                                    Attorney for Plaintiff
                                    **SECURITIES AND EXCHANGE COMMISSION**
                                    801 Brickell Avenue, Suite 1800
                                    Miami, Florida 33131
                                    Telephone: (305) 982-6300
                                    Facsimile:  (305) 536-4154

## CERTIFICATE OF SERVICE

I hereby certify that on September 13, 2010 I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

                                                          s/ Scott A. Masel
                                                          Scott A. Masel, Esq.

## SERVICE LIST

**SEC v. Acord, et al.**
**Case No.: 09-21977-CIV-JORDAN/MCALILEY**
**United States District Court, Southern District of Florida**

James D. Sallah, Esq.
Joshua A. Katz, Esq.

Sallah & Cox, LLC
2101 NW Corporate Boulevard , Suite 216
Boca Raton, FL 33431
Telephone:  561-989-9080
Facsimile: 561-989-9020
Email: jds@sallahcox.com
Email: jkatz@sallahcox.com
*Counsel for Defendants Sebastian De La Maza and Jose G. Perez*
Service via CM/ECF

Christopher Bruno
 Bruno & Degenhardt, PC
10615 Judicial Drive, Suite 703
Fairfax, VA 22030
Telephone:  (703) 352-8960
Facsimile:  (703) 352-8930
Email:  c.bruno6@verizon.net
Counsel for Alberto J. Perez
Service via CM/ECF

Mark David Hunter, Esq.
Leser Hunter Taubman & Taubman PLLC
255 University Drive
Miami, FL 33134
Email: mdhunter@lhttlaw.com
*Local counsel for Defendant Alberto J. Perez*
Service via CM/ECF

Rebekah J. Poston, Esq.
Jason Daniel Joffe, Esq.
Squire Sanders & Dempsey LLP
200 S Biscayne Boulevard, 40th Floor
Miami, FL 33131-2398
Telephone:  305-577-7000
Facsimile: 305-577-7001
Email: rposton@ssd.com
Email: jjoffe@ssd.com
*Counsel for Defendants Acord and Growney*
Service via CM/ECF

Thomas M. Bradshaw, Esq.
Kirra N. Jones, Esq.
White Goss Bowers March Schulte & Weisenfels, P.C.
4510 Belleview Ave., Suite 300
Kansas City, MO 64111

Telephone: (816) 753-9200
Facsimile: (816) 753-9201
E-mail:tbradshaw@whitegoss.com / kjones@whitegoss.com
*Counsel for Defendants Acord and Growney*
Service via CM/ECF

David M. Garvin, Esq.
200 South Biscayne Boulevard
Suite 3150
Miami, Florida 33131
E-mail: ontrial2@aol.com
*Counsel for Defendant Thomas L. Borell*
Service via CM/ECF