UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.  09-21977-CIV-JORDAN

| | |
|---|---|
| SECURITIES AND EXCHANGE | ) |
| COMMISSION | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| SEBASTIAN DE LA MAZA, et al. | ) |
| | ) |
| Defendants. | ) |
| _____ | ) |

### ORDER ON MOTIONS FOR SUMMARY JUDGMENT

Mr. Borell and Dr. De La Maza have filed motions for summary judgment with respect to the Securities and Exchange Commission's claims against them for violation of §10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5. Following oral argument, and for the reasons stated below, Mr. Borell's motion [D.E. 89] is GRANTED and Mr. De la Maza's motion is [D.E. 168] is DENIED.

### I. FACTUAL BACKGROUND

The SEC alleges that Mr. Borell and Dr. De la Maza engaged in insider trading. According to the SEC, they acquired information, respectively, from Jose Mas and Vivian Mas regarding Odyssey Investment Partners' acquisition of Neff Corporation in 2005.

Neff is an equipment rental company incorporated in Delaware and headquartered in Miami. Before it was acquired by Odyssey, Neff was listed on the "pink sheets" system.[1]  Negotiations regarding this potential deal began in November 2004 and were subject to a confidentiality agreement.  In February of 2005, Neff and Odyssey executed a letter of intent regarding the proposed acquisition, and due diligence on the deal began in March of 2005.  Odyssey's acquisition of Neff

---

[1] The pink sheets, also known as "Pink Quote," is "an an inter-dealer electronic quotation and trading system for registered and unregistered securities."  *See S.E.C. v. Platforms Wireless Intern. Corp.*, 617 F.3d 1072, 1081 (9th Cir. 2010).

was announced on April 7, 2005.  The day the transaction was announced, Neff's stock price closed at $7.41, a 51% increase.  The deal closed in June of 2005.

## A.  MR. BORELL

The SEC's claim against Mr. Borell is based on his alleged acquisition and misappropriation of non-public, material information obtained from Jose Mas regarding the Neff-Odyssey deal.  The Mas brothers (Jose, Jorge, and Juan Carlos) were all shareholders of Neff, and occupied high-level positions at the company at the time of its acquisition.  Jose and Jorge Mas were both directors, and Juan Carlos was the chief executive officer.  Juan Carlos, as the CEO, played the principal role in negotiating the deal on behalf of Neff.  According to Juan Carlos, dating back to November of 2004, when the negotiations with Odyssey were in their preliminary stages, the company's directors – including Jose and Jorge Mas – were a part of Neff's "acquisition team."  Jose Mas has testified that, at the time, he considered the potential acquisition to be a "big deal" for the Mas brothers.

Mr. Borell's relationship with Jose Mas stems from their sons' friendship.  Their two sons met back in 2001-2002 at Epiphany pre-school when they were about three years old and they became good friends.  Besides interacting at school, the two children participated in the same after-school activities and they would visit one another's homes.  As a result of this friendship, the Borell family and the Mas family would see each other relatively often at school functions, after-school activities, birthday parties, and other events involving their sons' school friends.  Consequently, the Borell family and the Mas family developed a friendship – they became part of a circle of friends consisting of parents with children in the same class at Epiphany.  Mr. Mas testified that it was a "pretty close group of parents."  Along with other families, the Borell and Mas families would visit one another's homes for birthday parties for their sons; they invited one another to their sons' First Communion celebrations; and the Borells attended a Christmas gift exchange at the Mas' home on one occasion.  Although interactions between this large group of parents usually stemmed from school-related activities and involved their children, the parents would sometimes socialize without bringing their children along (e.g., occasional dinner outings).  Mr. Mas recalls going to dinner at the Borells' home along with other parents, and also recalls that the Borells attended a party at his home.  Additionally, Mrs. Borell testified that, during the period between late 2004 and April of 2005, she considered Mrs. Mas one of her closest friends, and that the Mas family was among the group of families – all with children attending Epiphany – that the Borells most frequently socialized

2

with during that period of time. This large group of families would also go on vacations together. For several years, they would make bi-annual trips to Disney World, as well as annual ski trips.

There is no evidence that the Mas and Borell families ever interacted by themselves (outside of the larger group of families), and both Mr. Borell or Mr. Mas indicate that they were, and are, not close friends. There is also no evidence that Mr. Borell and Mr. Mas had any history of business dealings whatsoever, including any attorney-client relations, or that they ever shared confidential information.

In March of 2005, during the due diligence period for the Neff acquisition, both the Borell and Mas families went on a group trip to Disney World (March 13-15, 2005) and a ski trip to Vail, Colorado (March 28, 2005). Jorge and Juan Carlos Mas went on the ski trip as well. Jose Mas has testified that, as far as he is aware, during the Disney trip Mr. Borell was not in a position to overhear any confidential information pertaining to the Neff-Odyssey deal that he may have been discussing with anyone else – though he cannot be certain. During the Vail ski trip, there is evidence that Mr. Borell and Mr. Mas spoke over the phone a number of times, but both testified that the substance of those conversations did not relate to the Neff-Odyssey deal. Additionally, Mr. Mas does not recall having any conversations, or engaging in any phone calls, relating to the Neff acquisition during the trip which Mr. Borell may have overheard, though he admitted that it is "possible" that he and his brothers discussed the deal at some point.

The facts relating to Mr. Borell's history of trading is not in dispute. Mr. Borell first purchased Neff stock in June of 1999, when he purchased $89,373 in shares that he eventually sold for a loss of $4,441. On January 12-13, 2005, he purchased 153,400 shares of Mastec stock for a total of $1.35 million, with the source of funds coming from checks deposited on January 19-20, 2005, totaling $1.1 million. In February of 2005, Mr. Borell purchased 750,000 shares of Terremark stock for a total of $723,673. At the end of February of 2005, Mr. Borell held 152,400 shares of Mastec valued at $1.4 million and 1 million shares of Terremark valued at $750,000, and his account had a debit balance of $292,722.

Between March 3, 2005, and March 7, 2005, Mr. Borell sold his entire position in Mastec for a loss of $9,700, and he used a majority of the proceeds to fund the purchase of shares in Neff and Terremark in the amounts of $250,840 and $525,595, respectively. Then, between March 27, 2005, and April 7, 2005, the date the deal was announced, he purchased $1,084,295 worth of Neff

stock.  To fund his purchases of Neff, Mr. Borell sold $1,077,650 in shares of Terremark for a loss of $171,000.  In total, during the five weeks between March 3, 2005, and April 7, 2005, he purchased $1.34 million in shares of Neff.  After the acquisition was announced, between April 13, 2005, and June 7, 2005, Mr. Borell sold 281,000 shares of Neff for $2.15 million, and on June 9, 2005, he exchanged the 19,000 shares that remained in his account.  His total profit on the 300,000 shares of Neff that he purchased amounted to nearly $1 million.

During the nine-month period preceding his stock purchases of January of 2005, Mr. Borell's average total monthly purchase of stock was less than $100,000; his largest accumulation of stock in any single company in a single month was $126,000 in Akamai Technologies (June of 2004); and his largest cumulative stock purchase of a single company was $231,000 of Mastec shares between September and November of 2004.

Mr. Borell says that back in 2004-2005 he was an avid day trader in stocks (allegedly spending 90% of his work days trading), and that all of his stock purchases were based solely off intuition, speculation, and rumors he claims to have heard.  He states that he purchased Mastec and Terremark stock back in early 2005 because he speculated that both companies were candidates to get "bought out."  Regarding Mastec, he noted that the death of Jorge Mas Sr., the former chairman of Mastec, was a reason why that company was a "buy-out" candidate.  This speculation was also fueled by what he dubbed "public knowledge" that the Mas family was "selling things," such as the Miami Freedom Tower.  For the same reasons, he believed Neff – a company owned, in part, by the Mas family – was also a "buyout candidate," and he therefore purchased shares of the company.  He claims to have sold his position in Mastec in order to purchase shares of Neff because he received some research from his stock broker, Claudio Salazar, that there was a lot of "insider purchases or moves" in Neff stock, and he observed that its price was increasing despite an absence of news regarding the company.  He also claims to have heard that Juan Carlos Mas was buying a brand-new 130-foot yacht, and that the Mas brothers were buying vacation homes in Vail and a brand new jet. He explained that he sold over  $1 million in shares of Terremark, and purchased over $1 million in Neff stock, between March 27, 2005, and April 7, 2005, because the price of Terremark had gone down substantially and Neff was going up on "no news."  Also, during the March 28, 2005, ski trip, he observed that Juan Carlos Mas, despite being there, was not skiing – and he speculated that, taking into consideration everything else he had been hearing, he was likely working on some type

of deal during the trip.

Mr. Borell made all his stock purchases through his broker, Mr, Salazar.  Mr. Salazar testified that – in assisting Mr. Borell with his account – he did not provide advice or analysis on Mr. Borell's potential trades, but just offered quotes and news relating to the subject securities.

## B.  DR. DE LA MAZA

The SEC's claim of insider trading against Dr. De La Maza is based on allegations that he obtained material, non-public information relating to the Neff-Odyssey deal from his daughter, Vivian Mas, who is married to former Neff CEO Juan Carlos Mas.  At the time of the alleged misappropriation, Vivian had already been married to Juan Carlos for twelve years and they had two children.  As indicated by both of them in depositions, Dr. De La Maza and Vivian share a close, loving relationship, speaking on an almost daily basis and seeing one another almost as often.

In late 2004, Dr. De La Maza and his wife came up with the idea of going on a European cruise in June of 2005 with Vivian and her family, as well as other family members and friends.  It was to be the first time that the family would go on a cruise to Europe, and Vivian's parents frequently called her to ask if she and the family would be able to attend.  Vivian reserved tickets for the cruise for her family in December of 2004, and paid the deposit in March of 2005.  When she paid the deposit, she was still unsure if and when Juan Carlos would be able to join her and their two children on the cruise – though she says that it was common that his availability be in question for vacations because of his schedule.

In early 2005, before the Neff acquisition was announced and before she paid the deposit on the cruise, Vivian discussed the potential deal Neff-Odyssey deal with Juan Carlos.  She says that this conversation, which was held in private, was the only time they discussed the potential acquisition.  She says she was not further apprised of any developments, she never saw any documents relating to the transaction, and she only learned of the acquisition again when it was announced on April 7, 2005.[2]  Vivian testified that she did not share this information with anyone, including her parents.  Additionally, she says that she never heard Juan Carlos discussing the potential deal with anyone else; that he never took any documents pertaining to the deal to Dr. De La Maza's home; that she never heard him discussing the transaction at the De La Maza home; and

---

[2]  The substance of their conversation was not provided in her depositions because Ms. Mas asserted the marital communication privilege.

that she never spoke to Dr. De La Maza about whether he should buy Neff stock.  Dr. De La Maza similarly testified that Vivian never informed him that anything "special" was happening with Neff; that she never told him that Juan Carlos was working on something important for Neff; that he never spoke to Vivian about business affairs at Neff; and that he never overheard her discussing the potential deal with Juan Carlos.

Subsequent to learning about the potential Neff acquisition from Juan Carlos, Vivian says that she informed her family and friends attending the cruise that Juan Carlos might not be able to go because he had meetings – without specifying what those meetings were about.  At some point in time after notifying her parents of this, Vivian overheard Dr. De La Maza speaking to his stock broker over the phone about purchasing Neff stock.  She says that this made her nervous "because . . . someone could misconstrue [it] and think that [she] had given him information that he should not have had."  She "was very worried because [she] could see how people [would] think that [she] had tipped him."

Dr. De La Maza first purchased Neff shares on May 19, 1998, when he bought 3,000 shares in the company's initial public offering for $42,000.  Between June 16 and October 5, 1998, he purchased 12,500 shares of Neff on the secondary market for approximately $90,000.  In July of 1999, he then sold all these shares for a combined $250,000.  On December 5, 2001, he purchased 5,000 shares of Neff for $2,065, and later sold these shares on August 15, 2003, for $1,657.

During the due diligence period for the Neff acquisition, between March 16 and April 4, 2005, Dr. De La Maza made four separate purchases.  He bought a total of $111,126 of Neff shares in three separate brokerage accounts.  In one account, a Merrill Lynch account that he held jointly with his wife, he purchased $40,346 of Neff shares.  To fund the purchase, he sold approximately $35,000 in shares of Pediatrix Medical Group[3] and GlaxoSmithKline in this account, and deposited $7,898.  In the second account, a Merrill Lynch account in his name, Dr. De La Maza bought $59,032 in shares of Neff.  Prior to this purchase, the most recent purchase he had made in this account was acquiring $14,103 in shares of Pediatrix in October of 2004.  In the third account, a Merrill Lynch account in his wife's name, he used almost all the available cash to purchase $11,748 in shares of Neff.  This purchase was the first in this account in more than two years.  In total, to fund

---

[3] Dr. De La Maza made a profit of over $10,500 on the sale of the Pediatrix stock, a 380% return on investment.

all his purchases of Neff stock, he sold approximately $35,000 worth of other shares he held, and used cash reserves available for the other $75,000. Dr. De La Maza continued to hold his shares of Neff after the acquisition was announced, and sold them for $8.21 a share when the acquisition closed on June 7, 2005. In total, he made a profit of approximately $84,000.

It should also be noted that, after his last purchase of Neff stock, Dr. De La Maza's IRRA account still held almost $300,000 in cash. And even though his IRA account had over $33,000 in cash, Dr. De La Maza did not purchase any shares of Neff in this account. Prior to his purchase of $111,000 in shares of Neff, Dr. De La Maza's largest accumulation of any single stock was $116,064 in Mastec shares, purchased on three separate trading days over a span of approximately a year and a half.

Dr. De La Maza testified in his deposition that he did not have a set trading pattern in his stock purchases. In 1998, he owned stock in Banco Bilbao Viscaya, Computer Associates, Dycom, Electra Group, and Wild Oats. He explained that he bought Banco Bilboa stock because he owned a bank account with them when he was a student in Madrid; he did not recall why he purchased Computer Associates; he did not know why he bought Dycom or Electra Group, or what the companies do; and he purchased Wild Oats stock because his wife's friend raved about one of its stores located in Miami and he thought it would make him money.

Additionally, the SEC contacted Roberto Rosa, Dr. De La Maza's stock broker, who told them he did not find Dr. De La Maza's purchases of Neff stock to be unusual. Mr. Rosa stated that during the period between March 16 and April 4, 2005, Dr. De La Maza purchased shares of Neff as the price increased – something that he does not find uncommon.

Dr. De La Maza's explanation for his large purchases of Neff shares between March 16 and April 4, 2005, is that he "had a hunch," thought it was "going to do good," and that he had "faith." He testified that he did not consult with anyone before making these large purchases. Mr. Rosa said that he did not know why, or based on what information, Dr. De La Maza made these purchases.

## II. LEGAL STANDARD

A motion for summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Where

the non-moving party fails to prove an essential element of its case for which it has the burden of proof at trial, summary judgment is warranted. *See Celotex Corp.*, 477 U.S. at 323. That is, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.,* 391 U.S. 253, 289 (1968)). The court "must view all the evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party," *see Stewart v. Happy Herman's Cheshire Bridge, Inc.,* 117 F.3d 1278, 1285 (11th Cir. 1997), and "resolve all reasonable doubts about the facts in favor of the nonmovant," *see United of Omaha Life Ins. v. Sun Life Ins. Co.*, 894 F.2d 1555, 1558 (11th Cir. 1990).

## III. DISCUSSION

The SEC's claims against Mr. Borell and Mr. De La Maza for violation of §10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, are based upon the "misappropriation theory" of insider trading liability. In *United States v. O'Hagan*, 521 U.S. 642 (1997), the Supreme Court explained, and upheld, the misappropriation theory as a compliment to the "classical theory" of insider trading, and as a proper claim or charge for violation of §10(b) and Rule 10b-5.

The "classical theory" of insider trading liability proscribes a corporate insider from trading in the securities of his or her corporation on the basis of material, non-public information, because it is a breach of "a relationship of trust and confidence between the shareholders of a corporation and those insiders who have obtained confidential information by reason of their position with that corporation." *See id.* at 651-52 (citing *Chiarella v. United States,* 445 U.S. 222, 228 (1980)). "The classical theory applies not only to officers, directors, and other permanent insiders of a corporation, but also to attorneys, accountants, consultants, and others who temporarily become fiduciaries of a corporation." *See id.* at 652 (citing *Dirks v. SEC,* 463 U.S. 646, 655 n. 14(1983)).

Alternatively, under the misappropriation theory, "a person commits fraud 'in connection with' a securities transaction, and thereby violates §10(b) and Rule 10b-5, when he [or she] misappropriates confidential information for securities trading purposes, in breach of a duty owed to the source of the information." *See id.* It is a form of insider trading where "a fiduciary's undisclosed, self-serving use of a principal's information to purchase or sell securities, in breach of

a duty of loyalty and confidentiality, defrauds the principal of the exclusive use of that information."
*See id.*   The classical and misappropriation theories of insider trading are complimentary: the
classical theory "targets a corporate insider's breach of duty to shareholders with whom the insider
transacts," while the misappropriation theory proscribes "trading on the basis of nonpublic
information by a corporate 'outsider' in breach of a duty owed not to a trading party, but to the
source of the information." *See id. See also SEC v. Yun*, 327 F.3d 1263, 1269 (11th Cir. 2003) ("The
misappropriation theory. . .imposes liability on 'outsiders' who trade on the basis of confidential
information obtained by reason of their relationship with the person possessing such information,
usually an insider.  Liability. . .is based on the notion that the outsider breaches 'a duty of loyalty and
confidentiality' to the person who shared the confidential information.") (citing *O'Hagan*, 521 U.S.
at 652)).

## A. MR. BORELL'S MOTION FOR SUMMARY JUDGMENT

Mr. Borell moves for summary judgment on the misappropriation claim brought against him,
arguing that the SEC has not proffered any evidence establishing: (1) that Jose Mas had an
expectation that Mr. Borell would refrain from trading Neff stock; (2) that Jose Mas entrusted
material, non-public information to Mr. Borell; (3) that Mr. Borell misappropriated material, non-
public information from Mr. Mas; and (4) that Mr. Borell and Mr. Mas had a relationship of trust
and confidence.  Based on this record, I agree with Mr. Borell that there is no evidence establishing
that he had a "duty of loyalty and confidentiality" to Jose Mas.  Because I find that SEC has not
offered any evidence supporting this element of its  misappropriation claim, I will only address this
element and do not need to address the remainder of Mr. Borell's arguments.

As stated above, "to prevail on an insider trading case [under the misappropriation theory],
the SEC must establish that the misappropriator breached a duty of loyalty and confidence owed to
the source of the confidential information." *See Yun*, 327 F.3d at 1271.  In *O'Hagan*, the Supreme
Court ruled that O'Hagan, an attorney, breached a "duty of trust and confidence" owed to his law
firm and his client when he traded securities on the basis of non-public information regarding his
client's planned tender offer for the common stock of another company. *See O'Hagan*, 521 U.S. at
653.  The Supreme Court did not, however, delineate the contours for a relationship giving rise to

a "duty of trust and confidence."[4]  *See SEC v. Cuban*, 620 F.3d 551, 555 (5ᵗʰ Cir. 2010) ("*O'Hagan* did not set the contours of a relationship of 'trust and confidence.").  Subsequently, after numerous courts wrestled with the issue, on August 24, 2000, the SEC implemented Rule 10b5-2, which provides a "non-exclusive definition of circumstances in which a person has a duty of trust or confidence for purposes of the 'misappropriation' theory of insider trading. . . ."  *See* 17 C.F.R. § 240.10b5-2.  The rule sets out three situations giving rise to such a duty:

> (1) Whenever a person agrees to maintain information in confidence;
>
> (2) Whenever the person communicating the material nonpublic information and the person to whom it is communicated have a history, pattern, or practice of sharing confidences, such that the recipient of the information knows or reasonably should know that the person communicating the material nonpublic information expects that the recipient will maintain its confidentiality;
>
> (3) Whenever a person receives or obtains material nonpublic information from his or her spouse, parent, child, or sibling; provided, however, that the person receiving or obtaining the information may demonstrate that no duty of trust or confidence existed with respect to the information, by establishing that he or she neither knew nor reasonably should have known that the person who was the source of the information expected that the person would keep the information confidential, because of the parties' history, pattern, or practice of sharing and maintaining confidences, and because there was no agreement or understanding to maintain the confidentiality of the information.

17 CFR § 240.10b5-2.

The SEC promulgated Rule 10b5-2, in large part, to broaden the definition of a "relationship of trust and confidence" provided by the Second Circuit in *United States v. Chestman*, 947 F.2d 551 (2ⁿᵈ Cir. 1991), a decision on misappropriation liability pre-dating *O'Hagan* by several years and employed by several courts in determining whether a "duty of trust and confidence" existed.  *See, e.g., United States v. Kim*, 184 F.Supp.2d 1006, 1011 (N.D.Cal. 2002) (" . . .the key case for examining the precise contours of misappropriation liability – i.e. what relationships can potentially give rise to liability? – is *United States v. Chestman*. . .").  In *Chestman*, the Second Circuit provided

---

[4]  When discussing the misappropriation theory, courts – including the *O'Hagan* Court – use the phrases "duty of loyalty and confidence" and "duty of trust and confidence" interchangeably. *See SEC v. Yun*, 327 F.3d at 1269 n. 13 ("We think that 'a duty of loyalty and confidentiality' is synonymous with 'a duty of trust and confidence,' and, accordingly, we use the expressions interchangeably.").

a relatively narrow scope for a "relationship of trust and confidence" under the misappropriation theory, ruling that it only encompassed "inherently fiduciary" relationships, such as attorney-client or employer-employee, and "similar relationship[s] of trust and confidence" that were the "functional equivalent of a fiduciary relationship." *See* 947 F.2d at 568. Using the fundamental underpinnings of a fiduciary relationship as its basis, Second Circuit concluded that a "similar relationship of trust and confidence" was characterized by reliance, de facto control, and dominance, where "confidence is reposed on one side and there is a resulting superiority and influence on the other." *See id.* at 569 (citations omitted).

Several courts have relied on *Chestman* to help determine whether a relationship gave rise to misappropriation liability. *See Kim,* 184 F.Supp.2d at 1015 ("relationship of trust and confidence" did not exist between two chief executive officers who shared confidences as members of the Young Presidents Organization because their relationship was not characterized by disparate knowledge and expertise, a persuasive need to share confidential information, and legal duty to render competent aid, thereby rendering it "not one of superiority, dominance, or control"). *See also SEC v. Kornman*, 391 F.Supp.2d 477, 488-89 (N.D.Tex. 2005) (complaint sufficiently alleged a "relationship of trust and confidence" because Mr. Korman, an attorney offering tax and estate-planning services, traded securities based on information provided by company executives seeking or utilizing his legal advice services pertaining to their companies, and because "under *Chestman* and its progeny, . . .reliance, de facto control and dominance between [Mr. Korman] and the [two executives] . . . [were] sufficiently alleged in the SEC's complaint."); *SEC v. Singer,* 786 F.Supp 1158, 1170 (S.D.N.Y. 1992) (noting that the *Chestman* decision provided a "general characterization of a type of relationship in which is appropriate to impose the responsibilities associated with a fiduciary association," the court denied a motion for summary judgement by the defendant where evidence showed two individuals were engaged in an "attorneys-client association intertwined with a confidential, personal relationship").[5]

---

[5]   In *Yun*, the Eleventh Circuit disagreed with the *Chestman* ruling in the context of establishing a "duty of trust and confidence" between a husband and wife. The Eleventh Circuit stated: "We are inclined to accept the . . .view that the *Chestman* decision too narrowly defined the circumstances in which a duty of loyalty and confidentiality is created between husband and wife." *See Yun*, 327 F.3d at 1272. The Eleventh Circuit ruled that, if the SEC could "prove that [a] husband and wife had a history or practice of sharing business confidences, and those confidences generally were maintained by the spouse receiving the information, then in most instances the conveying

The SEC concluded that the Second Circuit's ruling in *Chestman* had too narrowly circumscribed and characterized a "relationship of trust and confidence," in particular because its definition excluded non-business relationships. *See Yun*, 327 F.3d at 1273 n. 23 ("[T]he *Chestman* majority's approach does not fully recognize the degree to which parties to close to family and personal relationships have reasonable and legitimate expectations of confidentiality in their communications.") (citing Proposed Rules, Securities and Exchange Commission, Selective Disclosure and Insider Trading, Dec. 28, 1999, 64 Fed. Reg. 72590-01, 72602)).  Rule 10b5-2, therefore, codifies three circumstances giving rise to a "duty of trust and confidence" in the context of non-business relationships, and amplifies the scope of misappropriation liability well beyond the limited interpretation of *O'Hagan* provided by *Chestman*.  Since Rule 10b5-2 was made effective, neither the Supreme Court nor the Eleventh Circuit have issued any decisions regarding the breadth of misappropriation liability.  Accordingly, though it is a non-exclusive definition, Rule 10b5-2 provides a starting point for determining whether Mr. Borell's non-business relationship qualified as a "relationship of trust and confidence."

Turning to the application of the Rule to the SEC's claim against Mr. Borell, it is undisputed that Mr. Borell and Mr. Mas never expressly agreed to maintain information pertaining to the Neff-Odyssey deal confidential, *see* Rule 10b5-2(1), and that they are not family, *see* Rule 10b5-2(3). Thus, the SEC's claim is premised on its argument that, based on circumstantial evidence, there is a dispute of fact as to whether Mr. Borell and Mr. Mas had a "history, pattern, or practice of sharing confidences" that established a "duty of trust and confidence" under the misappropriation theory. *See* Rule 10b5-2(2).  In support of this contention, the SEC refers to the evidence demonstrating that the Borell and Mas families were part of a close group of families that socialized with some level of regularity.

The SEC is correct that it may prove violations of § 10b and Rule 10b-5 through

---

spouse would have a reasonable expectation of confidentiality such that the breach of the expectation would suffice to yield insider trading liability." *See id.* at 1273.  Notably, this ruling tracked the language of Rule 10b5-2(2), and cited it in support of its conclusion.  *See* Rule 10b5-2(2) ("duty of trust and confidence" exists where the parties "have a history, pattern, or practice of sharing confidences. . . ").  The Eleventh Circuit did not apply the Rule because the events in *Yun* occurred before it became effective.  *See Yun*, 327 F.3d at 1273 ("Our conclusion is bolstered by statements the SEC has made since the trading in this case took place. . .[in]SEC Rule 10b5-2, which became effective August 24, 2000 . . . .").

circumstantial evidence.  *See SEC v. Ginsberg*, 362 F.3d 1292, 1298 (11th Cir. 2004).  Although I agree that the SEC has offered sufficient circumstantial evidence that Mr. Borell possessed material, non-public information relating to the Neff-Odyssey deal and traded on that information (i.e. access and contact to Mr. Mas during the Neff-Odyssey due diligence period and unusual trading patterns during that period of time), it has not presented any evidence – not even circumstantial evidence – allowing a reasonably jury to find that Mr. Borell and Mr. Mas had any "history, pattern, or practice of sharing confidences" in accordance with Rule 10b5-2(2).  Both Mr. Borell and Mr. Mas have denied ever having shared any confidences with one another, and the SEC has failed to submit any evidence to the contrary.  *See Moore v. Chesapeake & O. Ry.* Co. 340 U.S. 573, 576 (1951) (noting that the "the possibility alone that [a] jury might disbelieve [a witness' testimony does not] make the case submissible to it").  It has not produced any circumstantial evidence of a previous instance, before Mr. Borell allegedly learned of the Neff-Odyssey deal, where Mr. Mas shared any confidential information of any kind with Mr. Borell.

      The SEC is, therefore, arguing that evidence of the relationship between the Borell and the Mas families constitutes circumstantial evidence that Mr. Borell and Mr. Mas had a relationship involving a "history, pattern, or practice of sharing confidences" under Rule 10b5-2(2).  But without any evidence (circumstantial or otherwise) bridging the vast distance between (a) being a part of a close group of families which socialize and (b) having "a history, pattern, or practice of sharing confidences," the SEC is asking me to make assumptions and speculate about the nature of their relationship.  *See Cordoba v. Dillard's, Inc.,* 419 F.3d 1169, 1181 (11th Cir. 2005) ("Speculation does not create a *genuine* issue of fact.").  Though the SEC is entitled to rely on circumstantial evidence to create a dispute of fact regarding the elements of a misappropriation claim, that does not mean that it can submit a modicum of evidence merely establishing a social friendship, and then ask – at the summary judgment stage – that I extrapolate from that evidence that Mr. Borell and Mr. Mas had a "history, pattern, or practice of sharing confidences."  If I were to adopt the SEC's argument, any evidence of a close relationship between two friends would create a dispute of fact as to whether a "relationship of trust and confidence" existed under the misappropriation theory.  This would render Rule 10b5-2's defined parameters a nullity, and expand the scope of misappropriation liability

far beyond Supreme Court's ruling in *O'Hagan*."[6]

Accordingly, I find on this record that Mr. Borell did not owe Mr. Mas a "duty of trust and confidence." The SEC has, therefore, failed to prove a necessary element of a claim under the misappropriation theory, and summary judgment is warranted. *See Celotex Corp.*, 477 U.S. at 323.

### B. Dr. De La Maza's Motion for Summary Judgment

Dr. De La Maza has moved for summary judgment on numerous grounds. I will discuss each in turn.

#### 1. The *Adler* and *Ginsberg* Cases Permit the Inference that Dr. De La Maza Engaged in Insider Trading

Dr. De La Maza argues that he is entitled to summary judgment on the SEC's misappropriation claim because the following four facts – required as elements of the claim – are undisputed: (1) he never possessed material, non-public information because the alleged source, Vivian Mas, has denied that she conveyed the information to him; (2) there is no evidence that the information Vivian Mas possessed and allegedly conveyed to him was material; (3) the information that Vivian Mas may have conveyed to him concerning her husband's inability to attend a family vacation was immaterial and non-confidential; and (4) he lacked the requisite scienter to prove a violation of § 10(b) and Rule 10b5-2. In contending that these facts are not in dispute, Dr. De La Maza cites his own denials and those of Vivian.

The SEC, faced with denials from the alleged source of the material, non-public information

---

[6] The SEC could not identify any legitimately analogous case where there was, at least, a dispute of fact that a "duty of trust and confidence" existed between individuals in relationship similar to the one between Mr. Borell and Mr. Mas. The SEC cited to *SEC v. Platt*, 565 F.Supp 1244 (W.D.Ok. 1983), but that case was one brought by the SEC under the tipper-tippee theory of insider trading and does not discuss or address whether Mr. Switzer owed Mr. Platt a "duty of trust and confidence." *See id.* at 1251-53. Also, the decision in *SEC v. Cuban*, another case referenced by the SEC at the January 6, 2011, hearing, is also fundamentally dissimilar from this case. There, the SEC alleged that Mr. Cuban had received confidential information from the CEO of Mamma.com regarding the company's investment of public equity offering, and that Mr. Cuban expressly agreed not to trade based on that information. *See* 620 F.3d at 552. In reversing the district court's dismissal of the complaint, the Fifth Circuit concluded that the SEC had sufficiently alleged that the CEO and Mr. Cuban had an understanding that Mr. Cuban would not trade on the basis of the confidential information, in accordance with Rule 10b5-2(1). *See id.* at 557-58. Here, the SEC has not alleged, or brought forth any evidence, that Mr. Borell entered into an explicit agreement with Mr. Mas not to trade based on confidential information relating to the Neff-Odyssey deal.

(Vivian Mas) and from the alleged misappropriator (Dr. De La Maza), posits that it has presented sufficient circumstantial evidence concerning the above issues to create a dispute of fact.  The SEC cites to *SEC v. Adler*, 137 F.3d 1325 (11th Cir. 1998), and *SEC v. Ginsberg*, 362 F.3d 1292 (11th Cir. 2004), as cases where – despite an absence of direct evidence – the combination of an individual's access to material, non-public information and his or her subsequent suspicious trading activity in related securities was considered viable evidence of a violation of § 10(b).

In *Adler*, the board of directors of Comptronix Corporation held a special meeting on November 15, 1992, attended by Richard Adler, an outside director.  At that meeting, the Comptronix directors were informed about potential fraud in which the executives at the company had overstated its income.  *See* 362 F.3d at 1329.  The next day, Mr. Alder's friend and associate, Harvey Pegram, called Mr. Alder's home at 7:53 a.m.  The call lasted 72 seconds.  *See id.* at 1329-30.  Two minutes later, Mr. Pegram called his wife, and twelve minutes later she called their stock broker and placed an order to sell 50,000 shares of Comptronix.  *See id.* at 1330.  From that day on, over an eight-day period of time, the Pegrams sold a total of 150,000 shares.  *See id.*  Similarly, on November 16th at 8:02 p.m., Mr. Pegram called his business associate, Philip Choy, and an hour and a half later, Mr. Choy faxed his stock broker an order to sell 5,000 shares of Comptronix.  *See id.* This sequence happened with yet another of Mr. Pegram's associates, Domer Ishler, who sold 300 put options of Comptronix after two conversations with Mr. Pegram.  *See id.* at 1330-31.  On November 25th, Comptronix announced that certain officers had been suspended for overstating gross profits, and Comptronix's stock lost 72% of its value.  *See id.* at 1329.

Based on these facts, the SEC brought a civil action against Mr. Adler, Mr. Pegram, Mr. Choy, and Mr. Ishler.  Following a hung jury, the district court granted judgment as a matter of law to Mssrs. Pegram, Adler, and Choy, and summary judgment to Mr. Ishler.  *See id.* at 1331-32.  The district court ruled that "the calls from Pegram to Alder, from Pegram to his wife, and from Pegram's wife to her stockbroker, raised a 'possible reasonable inference' that Pegram received inside information from Alder, but 'any such inference' was rebutted by evidence of Pegram's preexisting plan to sell [Comptronix stock]."  *See id.* at 1332.  The district court's decision as to the other three individuals was based on the conclusion that the "'the facts and circumstances related to the other defendants [were] similar [to Pegram] and the principles [were] the same."  *See id.*

The Eleventh Circuit reversed.  First, it concluded that, pursuant to well-established law, the

"SEC [had] raised a reasonable inference that Pegram possessed nonpublic information by producing evidence of the suspicious timing of Pegram's sale of the stock and evidence of the phone calls between Alder, Pegram, and Pegram's wife." *See id.* at 1340 (citations omitted). The fact that Mr. Choy immediately sold Comptronix stock after his conversation with Mr. Pegram also supported this inference. *See id.* It noted, however, that "where an inference of possession of inside information arises from the suspicious timing of the sale, a credible and wholly innocent explanation for said sale and timing tends to rebut the inference." *See id.* at 1341. Applying this principle, the Eleventh Circuit ruled that, despite what it considered to be "strong evidence" that Mr. Pegram had a pre-existing plan to sell Comptronix stock, a reasonable jury could find that Mr. Adler tipped Mr. Pegram, and thus, Mr. Pegram was in possession of, and traded based upon, material, non-public information. *See id.* at 1341-42 ("Although Pegram's evidence is strong, we cannot conclude that a reasonable jury was required as a matter of law to believe every detail of the plan asserted by Pegram, nor was the jury required to believe the allegedly innocent explanation for the telephone calls."). The court reversed the district court's ruling as to the other defendants applying the same logic, except that the other defendants had significantly weaker evidence of an innocent explanation for their trades. *See id.* at 1342-43.

In *Ginsberg*, the SEC alleged that Scott Ginsberg violated §10(b) by communicating material, non-public information to his brother Mark and to his father Jordan, who then traded securities on that information. *See* 362 F.3d at 1295. Ginsberg was the CEO of Evergreen Media Corporation, which owned and operated several radio stations. In July of 1996, Evergreen entered into discussions with EZ Communications, which also owned radio stations, regarding Evergreen's potential acquisition of EZ. *See id.* at 1296. What followed was a pattern of Mr. Ginsberg obtaining information relating to bidding on the acquisition of EZ, phone calls to his father and brother, and large purchases of EZ stock by them. *See id.* Though Evergreen's bid for EZ fell through, on August 5, 1996, EZ ultimately merged with another radio station and its stock price rose 30% on that date. *See id.* Between July 15th and July 29th, Mark and Jordan Ginsberg had purchased, respectively, 48,800 and 25,000 shares of EZ. Mark's shares had increased $664,024 in value, and Jordan's had increased $412,875, by August 5, 1996. *See id.* at 1297.

Similar to what happened in *Adler*, the district court, after a jury verdict against Scott Ginsberg, granted a renewed motion for judgment as a matter of law. Again, the Eleventh Circuit

reversed. It concluded that the pattern of calls and trades was similar enough to *Adler* to create an inference of insider trading. *See id.* at 1300. The Eleventh Circuit noted that, compared to *Adler*, Ginbserg offered stronger evidence suggesting the parties had a history of more frequent conversations and that the trades made were not unique. *See id.* at 1301. Additionally, there were longer spans of time between the conversations and trades, and Mr. Ginsberg presented evidence of public information motivating the trades and offered innocent explanations for the calls. *See id.* Nonetheless, consistent with *Alder*, the Eleventh Circuit ruled that "it was up to the jury to choose between those competing plausible theories of fact." *See id.* If evidence of innocent explanations was enough to overturn a jury's verdict, "family members who regularly traded in a particular stock or type of stock could trade based on insider information with impunity." *See id.*

Though *Adler* and *Ginsberg* are both insider trading cases based on tipper-tippee claims, the general principle espoused by the Eleventh Circuit in both decisions applies here: that evidence of large, unusual, and highly profitable trades, coupled with exposure to or communication with someone in possession of material, non-public information relating to the securities traded, creates an inference that the trader was acting on inside information. *See, e.g., Ginsberg*, 362 F.3d at 1299 ("The temporal proximity of a phone conversation between the trader and one with insider knowledge provides a reasonable basis for inferring that the basis of the trader's belief was the inside information. The larger and more profitable the trades, and the closer in time the trader's exposure to the insider, the stronger the inference that the trader was acting on the basis of inside information."). Applying this principle, the SEC argues that Dr. De La Maza's close, daily exposure to Vivian Mas, who possessed material, non-public information regarding Neff, his having learned that she could not attend a cruise in March of 2005 because her husband had to attend "meetings," and his large, irregular, and highly profitable trades of Neff stock in March and April of 2005 creates a rebuttable inference of insider trading that precludes summary judgment. I agree with the SEC.

To be more specific, these are the facts creating such an inference. First, in early 2005, after Neff and Odyssey entered into a confidentiality agreement and around the time the companies executed the letter of intent regarding the acquisition, Vivian Mas had a private conversation with her husband, Juan Carlos, about the Neff-Odyssey deal. This, at a minimum, creates a dispute of fact as to whether she possessed material, non-public information. *See Basic Inc. v. Levinson*, 485 U.S. 224, 238 (1988) (ruling that knowledge of preliminary merger negotiations can be considered

material information).  *See also SEC v. Geon Industries, Inc.,* 531 F.2d 39, 47-48 (2ⁿᵈ Cir. 1976) (Friendly, J.) ("Since a merger in which it is bought out is the most important event that can occur in a small corporation's life, to wit, its death, we think that inside information, as regards a merger of this sort, can become material at an earlier stage than would be the case as regards lesser transactions-and this even though the mortality rate of mergers in such formative stages is doubtless high.").  Second, around the time when Vivian was made aware of the deal, Dr. De La Maza would have daily conversations with her, and they would see each other almost as often.  Third, in March of 2005, right before Dr. De La Maza began purchasing shares of Neff, Vivian informed him, and others, that she could not go on the European cruise because Juan Carlos was required to attend meetings.  The meetings that he would be attending were for the Neff-Odyssey deal, but Vivian claims she did not inform Dr. De La Maza of the nature or substance of the meetings.  Nonetheless, Dr. De La Maza's subsequent conduct – purchasing an unusual amount of Neff shares – permits an inference otherwise.  Fourth, between March 16 and April 4, 2005, after having learned that Vivian would not be able to go on the cruise because of Juan Carlos' unspecified meetings, and during the due diligence period on the deal, Dr. De La Maza bought a total of $111,126 of Neff shares, which he exchanged for roughly a 75% profit a couple months later.  As noted above, prior to these purchases, his largest accumulation of stock was $116,064 of Mastec, which he acquired over a one and a half year period.  Fifth, unlike *Adler*, Dr. De La Maza has not offered any evidence that his large purchase of Neff shares was pre-planned or that it was based on public information.  Instead, he has stated that he "had a hunch."  Though he has pointed out that he had made previous stock purchases on a whim or gut feeling, and without any real knowledge of the company, none of those purchases were as large or profitable of his purchase of Neff in 2005.  His explanation for his purchase of Neff shares is, thus, substantially weaker than those offered in *Adler*.

Taking into consideration all these facts and applying the Eleventh Circuit's rulings in *Adler* and *Ginsberg*, I conclude that the SEC has presented sufficient circumstantial evidence to permit a reasonable jury to find that (1) Dr. De La Maza possessed material, non-public information, (2) that this information was conveyed by Vivian Mas, (3) that he purchased shares of Neff based on that information, and (4) that he did so with the requisite scienter.  In short, there are disputes of fact as

to these elements of the SEC's claim against Dr. De La Maza.[7]

## 2. THERE IS A DISPUTE AS TO THE CLAIM FOR ILLEGAL PROFITS

Dr. De La Maza also argues that, assuming he is found liable for insider trading, he should not be required to disgorge any profits realized on his Neff shares based on the stock's appreciation from the date of the public announcement of the deal, April 7, 2005, through the date that he exchanged them, June 7, 2005.

A court's "'power to order disgorgement extends only to the amount with interest by which the defendant profited from his wrongdoing.'" *See S.E.C. v. ETS Payphones, Inc.* 408 F.3d 727, 735 (11th Cir. 2005) (citation omitted). "The SEC's burden for showing the amount of assets subject to disgorgement . . is light: 'a reasonable approximation of a defendant's ill-gotten gains [is required] . . . . Exactitude is not a requirement.'" (citation omitted). *See id.* (citing *SEC v. Blatt,* 583 F.2d 1325, 1335 (5thCir.1978)

I disagree with Dr. De La Maza's argument at this stage. There is no evidence that he would have purchased any shares of Neff on April 7, 2005, had he not allegedly received material, non-public information from Vivian Mas. Thus, any profits stemming from the increase in the stock price after the April 7, 2005, may still be considered "causally connected" to the violation, because he never would have achieved those gains had he not allegedly purchased the Neff shares based on inside information. Moreover, any decision made at this stage of the litigation – before a jury has found that Dr. De La Maza is liable – pertaining to the disgorgement of funds would amount to an impermissible advisory opinion. *See National Advertising Co. v. City of Miami,* 402 F.3d 1335, 1339 (11th Cir. 2005) (courts are not permitted to render advisory opinions involving a "review of potential or abstract disputes"). Accordingly, summary judgment on this issue is denied.

## 3. DR. DE LA MAZA IS NOT ENTITLED TO SUMMARY JUDGMENT REGARDING THE SEC'S REQUEST FOR INJUNCTIVE RELIEF

The SEC's complaint also requests that Dr. De La Maza be "[p]ermanently restrain[ed] and enjoin[ed] . . .from violating Section 10(b) of the Exchange Act, 15 U.S.C. § 78(j), and Exchange Act Rule 10b-5, 17 C.F.R. § 240.10b-5." Dr. De La Maza argues that he is entitled to summary judgment pertaining to the injunctive relief that the SEC seeks against him because the SEC has not

---

[7] It should be noted, however, that, as I indicated at the hearing on the motions for summary judgment, the evidence brought by the SEC is certainly not strong or compelling. But at summary judgment my role is not to weigh evidence.

met its evidentiary burden for such relief, and also because the form of the injunction – dubbed an "obey-the-law" injunction – is not permitted by the Eleventh Circuit.

To show that it is entitled to injunctive relief against Dr. De La Maza, the SEC must show a "reasonable likelihood that [he] would violate the securities laws in the future." *See Ginsberg*, 362 F.3d at 1304. The factors to be considered when making this determination are: "the egregiousness of the defendant's actions, the isolated or recurrent nature of the infraction, the degree of scienter involved, the sincerity of the defendant's assurances against future violations, the defendant's recognition of the wrongful nature of his [or her] conduct, and the likelihood that the defendant's occupation will present opportunities for future violations." *See SEC v. Carriba Air, Inc.*, 618 F.2d 1318, 1322 (11th Cir. 1982).

In *Ginsberg*, the Eleventh Circuit reversed the district court's ruling refusing to enjoin Mr. Ginsberg from future violations of the Exchange Act, which is the type of injunctive relief being sought here by the SEC. It concluded that, though the district court applied the proper factors in making this determination, it had clearly erred in denying the relief because "each *Carriba* factor cut[] against Ginsberg . . ." *See id.* at 1305. However, a year later, the Eleventh Circuit noted – in footnote at the end of a decision on an unrelated matter – that "obey-the-law" injunctions, such as the one sought here, are unenforceable. *See S.E.C. v. Smyth,* 420 F.3d 1225, 1233 n. 14 (11th Cir. 2005) ("Because the injunctions are still before the district court, we would be remiss if we did not inform the court that they are unenforceable. . . .Each of the injunctions is a quintessential 'obey-the-law" injunction.' . . . An injunction must be framed so that those enjoined know exactly what conduct the court has prohibited and what steps they must take to conform their conduct to the law.") (internal citations omitted). This footnote, however, was clearly *dicta* because it did not pertain to the issue addressed in the motion, which was whether the district court was required to hold an evidentiary hearing to determine the amount of disgorgement. *See id.* at 1230. *See also Pretka v. Kolter City Plaza II, Inc.*, 608 F.3d 744, 762 (11th Cir. 2010) ("Statements in an opinion that are not 'fitted to the facts,' or that extend 'further than the facts of that case,' or that are 'not necessary to the decision of an appeal given the facts and circumstances of the case,' are *dicta*.") (internal citations omitted); *SEC v. Solow*, 554 F.Supp.2d 1356, 1361 (S.D.Fla. 2008) (concluding that footnote 14 in the *Smyth* decision is *dicta*).

Dr. De La Maza argues that *Symth* supersedes *Ginsberg* and previous Eleventh Circuit

20

decisions upholding the "obey-the-law" injunctions sought by the SEC.  He is certainly correct that the *dicta* set forth in *Symth* rejects these type of injunctions.  But I cannot conclude that prior Eleventh Circuit precedent upholding "obey-the-law" injunctions is overturned by the *dicta* in *Symth*. *See Pretka*, 610 F.3d 708 ("We are not required to follow *dicta* in our own prior decisions.  Nor for that matter is anyone else.") (internal citations omitted).  *See also Edwards v. Prime, Inc,*. 602 F.3d 1276, 1298 (11ᵗʰ Cir. 2010) ("[D]icta is not binding on anyone for any purpose."); *Randall v. Scott,* 610 F.3d 701, 708 (11ᵗʰ Cir. 2010) ("*Dicta* 'is neither the law of the case nor binding precedent.'") (citation omitted).  Judge Middlebrooks has also ruled that footnote 14 of *Smyth*, because it was *dicta*, did not supersede *Ginsberg* and other Eleventh Circuit cases upholding "obey-the-law" injunctions sought by the SEC.  *See SEC v. Solow*, 554 F.Supp.2d at 1361.  I further agree with Judge Middlebrooks that, regardless of whether the *Smyth* footnote is *dicta* or not, faced with conflicting panel decisions from the Eleventh Circuit – *Smyth* and *Ginsberg* – I am required to follow *Ginsberg* because it is the earlier one.  *See id.  See also United States v. Ohayon*, 483 F.3d 1281, 1289 (11th Cir. 2007) ("When a decision of this Court conflicts with an earlier decision that has not been overturned en banc, we are bound by the earlier decision."); *United States v. Hornaday*, 392 F.3d 1306, 1316 (11th Cir.2004) ("Where there is a conflict between a prior panel decision and those that came before it, we must follow the earlier ones.").  Accordingly, I conclude that the injunctive relief sought by the SEC is not barred by Eleventh Circuit precedent.

Additionally, at this stage of the proceedings, I cannot rule as a matter of law that there is not a "reasonable likelihood that [Dr. De La Maza] would violate the securities laws in the future." First, there is a dispute of fact as to Dr. De La Maza's liability under §10(b) of the Act, and thus, any decision rendered right now as to the injunctive relief sought by the SEC might – similar to the issue of disgorgement – constitute an impermissible advisory opinion.  *See National Advertising,* 402 F.3d at 1339.  Second, the parties have not submitted evidence pertaining to the factors to be considered under *Carriba*, such as "the sincerity of [Dr. De La Maza's] assurances against future violations and [his] recognition of the wrongful nature of his conduct."  Thus, summary judgment is denied concerning the SEC's request for injunctive relief.

### 4.  RULE 10B5-2 DID NOT EXCEED THE SEC'S RULEMAKING AUTHORITY AND DOES NOT VIOLATE DR. DE LA MAZA'S DUE PROCESS RIGHTS

Dr. De La Maza also argues that Rule 10b5-2 exceeded the SEC's rulemaking authority and

also violates due process.  Specifically, Dr. De La Maza argues that the Rule improperly establishes a "duty of trust and confidence" between family members that is contrary to the Supreme Court's interpretation of misappropriation liability in *O'Hagan*, and further, that it violates his due process because it improperly creates the presumption of a duty by placing the burden of proof on Dr. De La Maza to negate the existence of "duty of trust and confidence" with his daughter Vivian.

Rule 10b5-2 was promulgated by the SEC pursuant to its congressionally-delegated rulemaking authority to carry out the anti-fraud prohibitions of §10(b) of the Exchange Act.  *See* 15 U.S.C. § 78j(b) (authorizing the SEC to implement "such rules and regulations as the [it]  may prescribe as necessary or appropriate in the public interest or for the protection of investors").  An agency regulation interpreting a statute that the agency is charged with administering is typically afforded deference under the Supreme Court's decision in *Chevron, USA, Inc. v. NRDC, Inc.,* 467 U.S. 837 (1984).  Under *Chevron*, there is a two-step process in determining whether deference to the SEC in promulgating Rule 10b5-2 is appropriate.  First, I must determine "whether Congress has directly spoken to the precise question at issue.  If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."  *See id.* at 842-43.  However, if I "determine[] Congress has not directly addressed the precise question at issue, [and] the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute."  *See id.* at 843.  Where Congress has not merely failed to address a precise question, but has given an "express delegation of authority to the agency to elucidate a specific provision of the statute by regulation," the agency's "legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute."  *See id.*

The statute at issue here, §10(b), states as follows:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange . . .[t]o use or employ, in connection with the purchase or sale of any security . . .any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC]  may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. 78j(b).  A plain reading of this language shows that it does not address the substance of Rule 10b5-2.  *See United States v. Corbin*, No. 09 Cr. 0463 (VM), 2010 WL 4236692, at *9

(S.D.N.Y. Oct. 21, 2010) (". . .§10(b) does not directly address the scope of the duties that, if breached through deception, may give rise to misappropriation liability")

Thus, the inquiry turns to whether Rule 10b5-2 is "arbitrary, capricious, or manifestly contrary to the statute," since, as noted above, §10(b) expressly authorizes the SEC to promulgate regulations in support of the anti-fraud provision. *See United States v. Mead,* 533 U.S. 218, 229 (2001) ("We have recognized a very good indicator of delegation meriting *Chevron* treatment in express congressional authorizations to engage in the process of rulemaking or adjudication that produces regulations or rulings for which deference is claimed.").

As discussed above, the SEC implemented the Rule because the *O'Hagan* decision did not provide much guidance or discussion concerning the contours of a "relationship of trust and confidence" under the misappropriation theory. *See* Selective Disclosure and Insider Trading, Exchange Act Release 42259, 64 F.Reg. 72590, at 72599-602 (proposed release of Rule: "[I]t is not settled . . . under which circumstances certain non-business relationships, such as family and personal relationships, may provide the duty of trust or confidence required under the misappropriation theory."). Because the *Chestman* decision had provided what the SEC considered a narrow or limited definition for a "relationship of duty and trust," and other courts had begun using that standard in assessing misappropriation claims, the SEC promulgated the Rule to offer a broader, more expansive framework for a "duty of trust and confidence." The SEC noted that this broader approach to misappropriation liability was necessary because there were a "large number of insider trading cases that involved trading by friends or family members of insiders," and that this form of insider trading "harms investors confidence in the integrity and fairness of the nation's securities markets." *See* 64 F.Reg. 72590 at 72599-602.

Based on this record, and Congress' express delegation of rulemaking authority to the SEC under § 10(b), I conclude that the Rule is reasonable in light of the need to clarify the scope of a "relationship of duty and loyalty" as set forth in *O'Hagan*, and to broaden what the SEC thought was an overly-restricted interpretation of these type of relationships. The *Chestman* decision and its progeny, none of which were binding precedent, were employing a standard for misappropriation claims that purportedly did not encompass a large number of the insider trading cases – those relating to family and friends – that the SEC concluded should be covered under § 10(b). Thus, the Rule is not "arbitrary, capricious, or manifestly contrary" to § 10(b), but a proper regulation further

implementing Congress' intent. *See Corbin*, 2010 WL 4236692, at *10 ("[T]he court finds that the SEC's exercise of its rulemaking authority to promulgate Rule 10b5-2 under § 10(b) is far from arbitrary, capricious, or contrary to § 10(b). Rather, it was buttressed by a thorough and careful consideration – one that far surpasses mere reasonableness – of the ends of § 10(b), the state of the current insider trading case law which included Supreme Court and Second Circuit decisions, and the need to protect investors and the market generally. Accordingly, the Court concludes that the SEC's construction of § 10(b) embodied in Rule 10b5-2 is '"based on a permissible construction of the statute."') (citation omitted).

Finally, I turn to Dr. De La Maza's argument that the Rule is unconstitutional because it shifts the burden to the defendant. Rule 10b5-2(3) provides that a "duty of trust and confidence" exists

> [w]henever a person receives or obtains material nonpublic information from his or her spouse, parent, child, or sibling; provided, however, that the person receiving or obtaining the information may demonstrate that no duty of trust or confidence existed with respect to the information, by establishing that he or she neither knew nor reasonably should have known that the person who was the source of the information expected that the person would keep the information confidential, because of the parties' history, pattern, or practice of sharing and maintaining confidences, and because there was no agreement or understanding to maintain the confidentiality of the information.

Upon reading this language, I do not find that the burden has been shifted to the defendant. The language, which is admittedly convoluted, provides that the communication of material, non-public information to a spouse, parent, child, or sibling establishes a "duty of trust and confidence" *if* there is an "agreement or understanding to maintain the confidentiality of the information" or *if* the parties "had a history, pattern, or practice of sharing and maintaining confidences." When re-worded in a more clear manner, it is evident that this language merely intends to codify, and make it explicitly clear that family members are subject to the two other provisions of Rule 10b5-2 that create a "duty of trust and confidence." *See* Rule 10b5-2(1) - (2). This was, in fact, one of the fundamental reasons why the Rule was implemented in the first place. Accordingly, I conclude that the Rule does not violate Dr. De La Maza's due process rights.

## IV. CONCLUSION

In conclusion, Mr. Borell's motion for summary judgment [D.E. 89] is GRANTED, and Mr. De La Maza's motion for summary judgment is [D.E. 168] is DENIED. This case, therefore, remains pending against Dr. De La Maza and Alberto Perez.

By February 28, 2011, the SEC and the remaining defendants shall file a revised estimate of how long the trial will last.  A new calendar call and trial date will then be set by a separate order.

DONE and ORDERED in chambers in Miami, Florida, this 15th day of February, 2011.

Adalberto Jordan
United States District Judge

Copy to:        All counsel of record

25