UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 09-CV-21977-MCALILEY
[CONSENT CASE]

SECURITIES AND EXCHANGE
COMMISSION,

    Plaintiff,

v.

ALBERTO PEREZ, *et al.*,

    Defendants.
_____/

**ORDER ON MOTION FOR FINAL JUDGMENT OF PERMANENT INJUNCTION AND OTHER RELIEF AGAINST ALBERTO PEREZ**

This matter comes before the Court on Motion by Plaintiff, the Securities and Exchange Commission ("the SEC"), for Final Judgment of Permanent Injunction and Other Relief against Alberto Perez [DE 265]. I have reviewed the parties' written submissions and applicable law. For the reasons stated below, Plaintiff's motion is granted in part.

**I. BACKGROUND**

Neff Corporation ("Neff") is a Delaware corporation with its corporate headquarters in Miami, Florida. [*See* DE 211, at p. 6]. In November, 2004, Neff was contacted by Odyssey Investment Partners, LLC ("Odyssey"), about a potential business combination. [*Id.* at p. 6]. On November 19, 2004, Odyssey and Neff entered into a confidentiality agreement and began negotiations. [*Id.*]. On January 31, 2005, Odyssey sent Neff a letter of intent in which Odyssey offered to purchase Neff for $450 million. [*Id.*]. On February 16, 2005,

Odyssey increased its offer to $470 million and sent Neff a revised letter of intent, and on February 23, 2005, Neff and Odyssey executed the letter of intent for $470 million. [*Id*.]. Between March 1, 2005 and March 14, 2005, representatives of Odyssey, attorneys, and accountants engaged in due diligence activities at Neff headquarters. [*Id*. at p. 7]. Neff's board of directors met on April 6, 2005 and approved the acquisition, and the next day announced that Neff was being acquired by Odyssey for an estimated price of $8.19 to $8.27 per share. [*Id*.].

The SEC filed suit against several individuals alleging insider trading in connection with the Neff acquisition. [*See* DE 1]. Three of the Defendants entered into consent judgments with the SEC, and the Honorable Adalberto Jordan granted summary judgment in favor of one Defendant. Thereafter the remaining two Defendants, Alberto Perez ("Perez") and Sebastian de la Maza ("de la Maza"), and the SEC, consented to jurisdiction before me, and the case was tried before a jury in June, 2011. The jury found de la Maza to not be liable, but concluded that Perez had violated Section 10(b) and Rule 10-b-5 of the Securities and Exchange Act of 1934 ("the Act"), by engaging in insider trading by means of misappropriating material, confidential information concerning the purchase of Neff stock. The SEC now moves for entry of a final judgement against Perez.

In their Joint Pre-Trial Stipulation, the parties agreed to certain facts that provide some context for the issues now before the Court. Juan Carlos Mas ("Mas") was the CEO of Neff. [DE 211 at p. 1-2]. Perez was a long-time personal acquaintance of Mas, and was also

2

employed by Mas to manage real estate projects. During the time when Neff was negotiating with Odyssey about the acquisition, Mas provided Perez office space in Neff headquarters, although he was not a Neff employee. Given their personal and professional relationship, Perez was in frequent communication with Mas. [*Id*. at p. 7-9]. Perez was very close to his brother, Jose Perez ("Jose"), who formerly worked at Neff, and the two were in frequent contact with each other. [*Id*. at 7, 9]. Perez and his brother jointly owned a securities brokerage account, and that account purchased 17,000 shares of Neff stock in March, 2005, while the confidential acquisition discussions were ongoing. [*Id*. at 9].

At trial, the SEC argued that Perez had access to confidential information regarding the acquisition through his relationship with Mas, as well as his position within the Neff headquarters, where activity concerning the acquisition was going on around him. [*See* Trial Transcript ("Tr.") Day 9 at pp. 6-9, DE 281]. The SEC further maintained that Perez knew that information concerning the acquisition was confidential, and that he breached a duty of confidentiality to Mas when he misappropriated the confidential information and used that information to trade in Neff stock, in violation of securities laws. [*Id*. at pp. 21-23].

Perez testified he had no knowledge of the purchases of Neff stock, because his brother, Jose, was in complete control of their joint brokerage account. [*See* Tr. Day 5 at pp. 189-90, DE 280]. The SEC argued that Perez's claim of ignorance was not believable. The SEC pointed to 39 separate purchases in the joint account, made over multiple days. [Tr. Day 9 at p. 5, DE 281]. The SEC produced evidence to show that on the days when Neff shares

were purchased, Perez and his brother spoke by telephone on numerous occasions. [Tr. Day 5 at pp 87-97, DE 280].

The SEC now moves for entry of a final judgment against Perez with the following relief: (1) a permanent injunction; (2) disgorgement with pre-judgment interest; and (3) a civil penalty.

## II. ANALYSIS

I address each form of relief sought by the SEC in turn.

### A.     **Permanent Injunction**

The SEC asks the Court to permanently enjoin Perez from further violations of Section 10(b) and Rule 10b-5. "[W]hether to grant or deny injunctive relief is addressed to the sound discretion of the district court. . . ." *SEC v. Caterinicchia*, 613 F.2d 102, 105 (5th Cir. 1980). To warrant injunctive relief, the SEC must establish that "'there is a reasonable likelihood that the defendant, if not enjoined, will engage in future violations of the securities laws.'" *SEC v. Gunn*, No. 3:08-CV-1013-G, 2010 U.S. Dist. LEXIS 88164 at * 10 (N.D. Tex. Aug. 25, 2010) (quoting *SEC v. Mize*, 615 F.2d 1046, 1051 (5th Cir. 1980), cert. denied, 449 U.S. 901 (1980). To prove this likelihood, the SEC must show more than past violations. *Id*. Courts look to several factors to determine whether a defendant's past conduct indicates that he is likely to violate securities laws in the future: [1] the egregiousness of the defendant's actions, [2] the isolated or recurrent nature of the infraction, [3] the degree of scienter involved, [4] the sincerity of the defendant's assurances against

4

future violations, [5] the defendant's recognition of the wrongful nature of his conduct, and [6] the likelihood that the defendant's occupation will present opportunities for future violations. *SEC v. Calvo*, 378 F.3d 1211, 1216 (11th Cir. 2004). I address each factor in turn.

### 1. Egregiousness

To determine whether a securities violation is egregious, courts consider several factors: whether the conduct was flagrant or merely a technical violation; whether the defendant's violation also constituted a breach of fiduciary duty; whether the violation caused others to suffer significant financial loss; and whether the violation arose out of a complex scheme to defraud. *Gunn*, 2010 U.S. Dist. LEXIS 88164 at *12-13.

In this case, Perez took advantage of the opportunity presented by his office being located at Neff headquarters at a time when the acquisition was being actively considered, and bought Neff stock based on confidential information he learned from his friend and employer, Juan Carlos Mas. Those trades would have to be considered flagrant rather than merely technical violations. Having used confidential information he learned from his long-time friend and employer, amounted to a breach of fiduciary duty to that friend and employer. Accordingly, the first two factors suggest that Perez's conduct was egregious. However, there is no evidence that anyone suffered any financial losses – significant or *de minimis* – due to Perez's Neff trades. Also, there is no indication that Perez was involved in a complex scheme to defraud; instead, it appears that an opportunity to make money presented itself,

5

and Perez acted on it. The second two factors lean against a finding of egregiousness; thus this consideration does not weigh in favor of or against injunctive relief.

### 2. Isolated or Recurrent Nature

Courts consider two factors to determine whether a defendant's actions were isolated or recurrent in nature: the length of time over which the violation or violations occurred, and whether the defendant is a first time or a repeat offender. *Gunn*, 2010 U.S. Dist. LEXIS 88164 at *18-19. In *SEC v. Opulentica*, 479 F. Supp. 2d 319, 329 (S.D.N.Y. 2007), the court found the defendant's violations were recurrent in nature when they continued over an 18 month period. In Gunn, on the other hand, the court found that the defendant's violations were isolated in nature where he made numerous stock trades over a two week period. 2010 U.S. Dist. LEXIS 88164 at *20. In this case, Perez bought Neff stock through 39 separate trades over a period of approximately one month. The nature of the violations is not isolated, but neither did the violations occur over an extended period. Moreover, Perez has no history of violating securities laws either before or after the Neff stock trades. Considering the evidence as a whole, I find that Perez's violations were more isolated than recurrent in nature, and therefore this consideration weighs against injunctive relief.

### 3. Degree of Scienter

To establish the scienter necessary for a finding of liability, the SEC must prove that the defendant acted intentionally, knowingly, or in a manner that was severely reckless. *Gunn* at *20. As the Gunn court noted, "by returning a verdict that Gunn violated Section

6

10(b) and Rule 10b-5, the jury necessarily found that Gunn 'knew, should have known, or was severely reckless in not knowing' that he was trading on material nonpublic information." *Id*. at *21. The same reasoning applies here. A jury found that Perez violated Section 10(b) and Rule 10b-5; the jury therefore concluded that Perez acted with scienter, a necessary element of those violations. Accordingly, this factor weighs in favor of the issuance of an injunction.

    **4.**    **Sincerity of Assurances**

Attached to his response to the SEC's motion is a declaration by Perez. In this declaration, Perez makes the following statements:

5. I have tremendous respect for this Court and the legal process, although I respectfully do not agree with the jury's verdict in this case.

6. I fully appreciate the importance of the securities laws and the SEC's role in protecting the marketplace.

7. I will never again place myself in a position where my conduct can be called into question by the SEC. For example, although I continue to have a relationship with my brother, Jose Perez, a co-defendant in this case, the nature of that relationship has undergone significant changes as a result of the instant case. Specifically, I no longer share any type of joint trading account with my brother. In addition, all business relationships with my brother now require my affirmative participation and a degree of oversight.

8. The SEC's investigation of me and the litigation related to this case have had an appreciable and negative impact on my life. The allegations have embarrassed me professionally and personally. Further, the investigation and trial have caused a painful reassessment of my relationship with my brother, Jose Perez, with whom I had previously been extremely close.

> 9. Although I do not intend to ever seek any association with a publically traded company and can assure the Court I will never in the future be associated with anyone who violates securities laws, I feel the imposition of any injunction at this time would add to the stigma I have already been subject to.

[DE 274 at pp. 28].

I find these assurances sincere. I reach this conclusion taking into consideration the evidence presented at trial and my observations of Perez, including his testimony. I also note that Perez has no history of otherwise violating the securities laws, or any other laws, for that matter. He appears to have been genuinely humiliated by his involvement in such a serious violation of the law. Given his personal history, and the impact I believe the investigation has had on him, I believe that Perez is not likely to violate the securities laws in the future. Accordingly, this factor weighs against an injunction against Perez.

### 5. Recognition of Wrongful Conduct

As the SEC points out, despite the jury's verdict, Perez continues to maintain that he was not responsible for any securities violations. Instead, he claims his brother made all the Neff trades in their joint brokerage account with his knowledge. Because he does not admit that he has violated securities laws, this factor appears to weigh in favor of an injunction. However, as the *Gunn* court noted,

> the mere fact that a defendant denies the Commission's allegations, proceeds to trial, and does not admit fault after losing at trial does not, standing alone, suggest that the defendant is likely to commit another violation of the securities laws. What matters is the manner in which the defendant conducts himself during the course of presenting the vigorous defense to which he is entitled.

*Gunn*, 2010 U.S. Dist. LEXIS 88164 at \*23-24.  The court went on to note that three factors suggest that a defendant may have a propensity for future violations.  The first, is where a defendant's protestations of innocence are patently unreasonable. *Id*. at \*26.  In this case, Perez's claim that his brother traded Neff stock without his knowledge is not patently unreasonable, even if the jury did not believe it.  The next factor is where a defendant lacks candor or offers inconsistent testimony. *Id*.  Here, Perez has been steadfast and consistent in his testimony about how the Neff trades occurred.  Last, repeated violations are likely where a defendant has failed to demonstrate "an appreciation of the critical importance of the securities laws and regulations, as well as the seriousness of the charges and verdict against him. . . ." *Id*. (citations omitted).  I find the statements in Perez's declaration indicate that he does appreciate the importance of securities laws, and is well aware of the seriousness of the charges against him.  In spite of his continued protestation of innocence, therefore, I do not find this factor weighs in favor of an injunction.

### 6. Likelihood of Future Opportunity

The last factor weighs against injunctive relief.  The SEC argues that "given his close business and personal relationships with individuals such as Juan Carlos Mas and Jorge Mas . . . who continue to sit on the boards of, and have involvement with, public companies such as Mastec . . . and Alberto Perez's history and practice of sharing business confidences with Juan Carlos and Jorge Mas . . . it is reasonably likely that Perez will again violate the securities laws." [DE 265 at p. 6 (citations to transcripts omitted)].  I disagree with the

9

SEC's assertion.  The evidence presented at trial suggests that Perez happened to be in a position where he heard confidential information.  At the time, Perez was working for Mas and had an office in Neff headquarters when active due diligence was taking place there.  Numerous people who were not normally in Neff headquarters were there on a daily basis, discussing the acquisition.  There was no evidence that Juan Carlos Mas or Jorge Mas deliberately passed information to Perez, and I conclude that Perez's continued association with them does not make it likely that he will commit future securities violations.  Moreover, having heard the testimony of Juan Carlos and Jorge Mass, I believe that they fully understand that it is very much in their interests to never again be associated with allegations of insider trading with Perez, or any anyone else for that matter.  Moreover "[i]t is well settled that a defendant who works as a securities professional is a defendant who practices an occupation that is likely to present him with the opportunity to commit future violations of the securities laws." *Gunn*, 2010 U.S. Dist. LEXIS 88164 at *33.  Perez does not work in the securities field, rather he works as a real estate consultant, a profession that does not afford particular opportunity for securities violations.  For all these reasons, this final factor weighs against the issuance of an injunction.

Considering all the factors as they relate to this case, I do not believe an injunction against Perez is warranted.  Most of the factors weigh against the SEC's position, and the bottom line is, injunctive relief is to be used to deter future violations.  The evidence before this Court strongly suggests that Perez is not likely to commit future securities violations.

The SEC's request for a permanent injunction is therefore denied.

### B. Disgorgement and Prejudgment Interest

Next, the SEC asks this Court to order Perez to disgorge his ill-gotten gains, along with prejudgment interest. Given the jury verdict against Perez, he does not dispute that disgorgement is an appropriate remedy in this case. He does, however, suggest that he be required only to disgorge the actual gains of approximately $400,000, and not be required to also pay prejudgement interest. [*See* DE 274 at p. 15].

Whether to award prejudgment interest and, if so, at what rate, falls within the Court's discretion. *See SEC v. Carillo*, 325 F.3d 1268, 1273 (11th Cir. 2003) (citing *Indus. Risk Insurers v. M.A.N. Gutehoffnungshutte GmbH*, 141 F.3d 1434, 1447 (11th Cir. 1998)). Courts impose prejudgment interest to prevent those found liable under the securities laws from enjoying any benefit accrued from the use of the ill-gotten gain. *SEC v. Yun*, 148 F. Supp. 2d 1287, 1293 (M.D. Fla. 2001) (citing *SEC v. Warde*, 151 F.3d 42, 50 (2d Cir. 1998)). A defendant's wrongdoing justifies awards of prejudgment interest in accord with the doctrines of fundamental fairness. *SEC v. K.W. Brown & Co.*, 555 F. Supp. 2d 1275, 1313 (S.D. Fla. 2007). In the context of Section 10(b) and Rule 10b-5 actions, like the case at bar, proof of defendant's scienter is sufficient to justify an award of prejudgment interest. *Id*.

In this case, the jury found that Perez acted with scienter. Moreover, he enjoyed the benefit of his nearly $400,000 gain during the years it took the SEC to bring this case to trial, and there is no indication that the SEC unnecessarily delayed bringing the case to trial,

unfairly causing the amount of prejudgment interest to increase. To allow Perez to keep interest that he did, or could, have earned on those funds would be a windfall, and not at all in keeping with the deterrent effect of the securities laws. Accordingly, the SEC's request for disgorgement along with prejudgment interest is granted. Perez shall disgorge the $399,395 he earned from trading his Neff stock, along with prejudgment interest, for a total of $561 965.78.[1]

## C. Civil Penalty

The SEC asks the Court to impose a penalty of three times the amount of profit he earned from trading in Neff stock, for a total of $1,198,185. [DE 277 at p. 8]. Under the Securities and Exchange Act, a Court may impose a civil penalty on a person found liable for insider trading. 15 U.S.C. 78u-1(a)(2). The amount of the penalty "shall be determined by the court in light of the facts and circumstances, but shall not exceed three times the profit gained or loss avoided as a result of" the insider-trading activity. *Id.* When determining the amount of the penalty, courts have considered various factors including: 1) the egregiousness of the defendant' violations, 2) the isolated or repeated nature of the violations, 3) the degree of scienter involved, 4) the amount of the illegal profits, and 5) the

---

[1] Courts have discretion in determining at what rate to impose prejudgment interest. Some courts have used the tax underpayment rate established by the Internal Revenue Service, IRC § 6621. *See SEC v. Colonial Investment Mgmt., LLC*, 659 F Supp. 2d 467, 502 (S.D.N.Y. 2009); *SEC v. K.W Brown & Co.*, 555 F. Supp. 2d 1275, 1313 (S.D. Fla. 2007). Using that rate and beginning the interest calculation on June 7, 2005, when Perez sold his Neff stock, the total amount of disgorgement is $561,965.78. In reaching this number, this Court relies on the figures suppled by the SEC in its prejudgment interest table [DE 265-1], which were not disputed by Perez.

deterrent effect of a penalty given the defendant's net worth. *SEC v. Ginsburg*, 2002 U.S. Dist. LEXIS 15154 at *15 (S.D. Fla. July 8, 2002) vacated on other grounds *SEC v. Ginsburg*, 242 F. Supp. 2d 1310 (S.D. Fla. 2002) reinstated *SEC v. Ginsburg*, 362 F.3d 1292 (11th Cir. 2004).

I have already considered the first three factors in relation to whether an injunction should be issued against Perez, and determined that Perez's actions were not particularly egregious, that the violations were more of an isolated than repetitive nature, and that a jury clearly found he acted with scienter. Thus, I turn my attention to the two final factors: the amount of profits earned, and the deterrent effect of a fine given the defendant's net worth. As for the first of those factors, Perez and his brother earned approximately $400,000 on their Neff stock: a considerable gain.

"The defendant's net worth and corresponding ability to pay has proven to be one of the most important factors that district courts consider when determining how much of a civil penalty to assess in an insider-trading case." *Gunn*, 2010 U.S. Dist. LEXIS 88164 at * 44. Perez filed a sworn declaration outlining his financial condition. [DE 274 at pp. 19-26]. In this declaration, Perez details his assets and liabilities, which demonstrate a net worth of $151,168.41. [*Id*. at p. 20]. The SEC argues that Perez has not provided an accurate picture of his finances, as his net worth is far smaller than it was in 2005, when he answered questions in the initial investigation against him. [*See* DE 277 at p. 8].[2] However, the SEC

---

[2] The SEC also states that Perez has the means to pay the $1.2 million penalty, because he owns approximately $1.4 million in real estate. The SEC fails to note that the real estate carries a

13

offers only an unsupported assertion that Perez's statement of his finances is untrue, while Perez has submitted a sworn declaration. Given the evidence on the record, I see nothing to refute Perez's claims. Moreover, it is not at all surprising that someone like Perez, whose assets lie mainly in real estate, would have a significantly decreased net worth from 2005 to 2011, given the conditions of the real estate market in recent years. Accordingly, I accept Perez's statement of his financial condition, and his approximate net worth of $150,000.

Given Perez's relatively low net worth, and the fact that he is already obligated to disgorge over $561,000, I, like other courts considering similar scenarios, find that a civil penalty at the low end of the scale is appropriate. *See, e.g., Gunn*, 2010 U.S. Dist. LEXIS 88164 at *45, 53 (imposing a $50,000 penalty where the defendant's net worth was less than the amount of disgorgement); *Yun*, 148 F. Supp. 2d at 1297-98 (assessing a penalty of $100,000 on a defendant whose net worth was less than the $269,000 the court had ordered him to disgorge); *SEC v. Soroosh*, No. 98-35006, 1998 U.S. App. LEXIS 32651, at *8 (9th Cir. Dec. 24, 1998) (affirming the district court's decision to assess a $160,000 penalty against a defendant whose insider trading had netted him more than $500,000 in profit on the ground that the $160,000 fine "was the approximate balance left in [the defendant]'s brokerage accounts after payment of disgorgement, prejudgment interest, and expert witness expenses"): *SEC v. Pardue*, 367 F. Supp. 2d 773, 777 (E.D. Pa. 2005) (declining to impose penalties sought by the SEC that would result in the defendant and his family's financial

---

mortgage of approximately $1.2 million. [*See* DE 277 at p. 8; *see* DE 274 at p. 20].

ruin).

Considering all the information before the Court, I conclude that a civil penalty of $50,000 most fairly advances the purposes of the Act, and I therefore impose that penalty on Perez.

### III. CONCLUSION

For the reasons described above, it is ORDERED that the SEC's Motion for Final Judgment of Permanent Injunction and Other Relief against Defendant Alberto Perez [DE 265], is GRANTED in part and DENIED in part as follows:

1. The motion for permanent injunction against Alberto Perez is DENIED.

2. The motion for disgorgement with prejudgment interest is GRANTED. Perez shall disgorge $561,965.78.

3. The motion for civil penalty is GRANTED in part. Perez shall pay a civil penalty of $50,000.

DONE and ORDERED in chambers at Miami, Florida, this 17th day of November, 2011.

*/s/ Chris McAliley*
CHRIS MCALILEY
UNITED STATES MAGISTRATE JUDGE

cc: Counsel of record